**Sadie E. COLE et al., Plaintiffs,**

v.

**Carla A. HILLS et al., Defendants.**

**Civ. A. No. 74–1872.**

United States District Court,
District of Columbia.

May 21, 1975.

Florence Wagman Roisman, Washington, D. C., for plaintiffs.

Robert M. Werdig, Asst. U. S. Atty., Washington, D. C., for defendants.

## MEMORANDUM AND ORDER

GESELL, District Judge.

This class action was brought on behalf of the former tenants of a low-income, multi-family housing project which the Secretary of the Department of Housing and Urban Development decided to tear down. The facts are summarized in this Court's Findings of Fact and Conclusions of Law filed February 7, 1975, granting a preliminary injunction halting further demolition and permitting the tenants to return. *Cole* v. *Lynn,* 389 F.Supp. 99 (D.D.C.1975). The Government now moves to dismiss, or in the alterantive for summary judgment, on the grounds that the Secretary's decision to demolish the project was a proper exercise of discretion. The defendants also seek to be relieved from certain portions of the Court's preliminary injunction.

Defendants now attempt to justify as a proper exercise of discretion the Secretary's decision to demolish the project by arguing that the Secretary may not seek to preserve "housing for housing's sake" but must also give weight to his statutory duty to "eliminate blight." (Defendants' Memorandum in Support of Motion to Dismiss, 8–10). They argue that the project had become "blighted, vandalized, unattractive and unsafe" and that the area needed to be "revitalized" by the construction of single-family dwellings in accordance with the District of Columbia Government's master plan.[1]

This argument, which makes explicit attitudes which were implicit in the contemporaneous decision documents, demonstrates that the Secretary has confused his role in slum clearance with his role in housing. Where Congress provided for slum clearance or urban renewal programs, that is the destruction of housing which is "serving an undisputed housing need," *Cole* v. *Lynn, supra,* 389 F.Supp. at 102, in the service of civic betterment, it required that at least as many low- and moderate-income housing units be created by the plan as are destroyed, unless the Secretary certifies that there is already a surplus of such housing in the area. 42 U.S.C. § 1455 (h). Because there is an acute housing shortage in the Washington area, the Secretary's decision to destroy this project, for what are now admitted to have been in part aesthetic reasons, has resulted in many of the tenants being forced into even more intolerable conditions.[2] To the extent the Secretary believed he could destroy this project on the grounds it had become a vertical slum without first determining that there was available in the area affordable replacement housing in comparable or better condition, not only for the individual tenants but for their economic class as a

1. Of course, plaintiffs take issue on the factual level with these assertions, claiming the project's decline is attributable to HUD's mismanagement after taking it over.

2. For example, the affidavit of one tenant who paid $84.00 per month for a two-bedroom apartment at Sky Tower indicates she has been paying $189.50 a month, out of a total income of $234.00 in welfare she receives monthly for herself and her two children, for a two-bedroom apartment elsewhere. Other affidavits reveal comparable situations.

Even the former Sky Tower tenants who have been lucky in that they were able to secure subsidized housing with the National Capital Housing Authority did so only by excluding others on the 7,500-family waiting list.

whole, he acted in derogation of the statutory scheme.

■ This error was frankly acknowledged in oral argument when defendants' counsel maintained that although the project may appear to be serving a housing need in the city as a whole, when it is "dissected microscopically from the larger body" it can be seen to be "a blight." This kind of tunnel vision, which evaluates a project against the ideal of "safe, sanitary, decent" housing rather than in relation to the practical alternatives available, is capricious and arbitrary.

The second ground advanced to defend the Secretary's decision is that he made a sound "business decision" in light of the prior history of the project. The Court has already held, *Cole* v. *Lynn, supra,* that the Secretary's decision was infected with several errors of statutory construction and, after re-examination, the Court adheres to its earlier holdings. Furthermore, there are disputed factual issues as to what factors actually influenced the Secretary's decision and in what degree.[3]

■ According to the most recent estimates by HUD, upgrading the eight previously rehabilitated buildings containing 63 units to the standards of the housing code, and tearing down the two still standing which have not been rehabilitated, would cost only $139,000. (Staller Affidavit, May 14, 1975). Such expenditures are specifically permitted under § 207(*l*) of the National Housing Act, 12 U.S.C. § 1713(*l*). Congress contemplated that the Special Risk Insurance Fund would operate at a loss to be covered by appropriations. H.R.Rep.No. 1585, 90th Cong., 2d Sess. 13–14(1968). Unless there is a rational basis to believe more comparable units of housing can be provided by using the $139,000 to

insure additional mortgages for new construction than by rehabilitating 63 existing units, the Secretary's "business decision" is unsound. The record indicates no such comparative analysis by HUD.

In enacting 42 U.S.C. § 1441a(b) and (c) in August, 1974, Congress specifically found that HUD had "not directed sufficient attention and resources to the preservation of existing housing" and mandated a "greater effort" in that direction. There has been no showing that HUD's Property Disposition Handbook for Multifamily Properties, HM 4315.1 (Feb. 17, 1971), the operative source for staff decisions in this area, was changed in any way to reflect this explicit direction by Congress to concentrate more effort on saving existing housing. Moreover, HUD's analysts stopped with the conclusion that the project could not be operated profitably at fair market rents without an operating subsidy. Section 8(c)(1) of section 201(a) of Pub.L. 93–383, enacted August 22, 1974, a month before the final decision to demolish this project was made, specifically changed the law to provide that the Secretary might pay rent subsidies to individual tenants up to 20 percent in excess of fair market rentals. The conclusion that the project could not be operated was not, so far as this record shows, re-examined in the light of these new resources, nor has HUD seen fit to do so during the course of this litigation.

The motion to dimiss will be denied, every indication in the record to date being that the Secretary's discretion has not been exercised in a rational manner.

In addition, the defendants ask to be relieved from paragraphs 5 and 6 of the Court's Order of Preliminary Injunction filed February 7, 1975. These require

---

3. For example, it appeared to the Court from the documents submitted earlier that the alternative, proposed by the staff, of retaining only the rehabilitated buildings was rejected because it was thought they shared heating systems with buildings which were to be torn down. The Government now admits this is not true, but claims the mistake "played no significant role in the decision to demolish." Such factual issues must await resolution at trial.

the Secretary to "restore with reasonable diligence each of the units and common areas in the eight rehabilitated buildings to a condition at least as decent, safe and sanitary as that existing as of September 17, 1974," the date of the decision to demolish, and to permit any tenant family which desired to do so to return to Sky Tower under the terms of its previous tenancy.

Experience has confirmed the Court's view that the ultimate destruction of the project through vandalism is certain, in spite of guards, unless the project is inhabited.

The basis of the defendants' claim that it will cost $535,000 to restore the buildings, now inexplicably reduced to $139,000, has never been submitted to the Court. Moreover, HUD uses complete compliance with the housing code as its benchmark in generating cost estimates. This is substantially more than required by the Court's Order. No major rehabilitation is contemplated *pendente lite,* but only that HUD return the buildings to the minimally habitable conditions existing as of the time it evicted the tenants. On March 7, 1975, at defendants' instance, the Court specifically clarified its Order in open court to make clear that no repairs need be undertaken of units except those needed to house returning tenants. There are 15 families already back in Sky Tower, 18 others have indicated their desire to move back, and 22 additional families have not as yet been located.

No less is require if the project is to continue to exist during this litigation.

■ Defendants' motion to be relieved from certain requirements of the Preliminary Injunction accordingly will be denied. Indeed, the Order must be strengthened since it has come to the attention of the Court that HUD has chosen not to attempt good-faith compliance with the Court's Order. No informed or even casual observer can fail to recognize that inadequate housing for low-income families is at the root of the social unrest, the violence and the general squalor that typifies large sections of many metropolitan areas, including the District of Columbia. Congress has long recognized that the public interest requires this situation be remedied. It has passed statutes and appropriated large sums to this end. The instant case illustrates the wide gap that persists between this legislative commitment to action and the performance by HUD to which Congress has delegated responsibility.

In this concrete instance HUD has ignored its responsibilities in spite of the urgent need for low-income housing in the Nation's Capital and an effective Order of this Court.

No low-income family will be housed by creating another vacant lot. Persisting in its determination to tear down useful housing constructed at Government expense, HUD continues to refuse to spend money to make the structures again minimally habitable. Tenants now in the structures and others who seek accommodation have brought forward substantial grounds to conclude that HUD has ignored its statutory responsibilities. It is no answer for HUD to say that demolition is more convenient, less expensive and justified by an alleged right to exercise unreviewable discretion. Nor can it fob off responsibility by pointing to the distressing lack of effective support which has so far been indicated by local authorities. HUD has a mandate to act with more sensitivity and courage and it is the responsibility of the Court to see that this mandate is carried out as Congress directed.

HUD's lethargic and minimal response to the Court's Order must cease. It must proceed to rehabilitate. The preliminary injunction previously entered and largely disregarded must be particularized in the light of experience to assure compliance.

■ Accordingly, within seven days from the date of this Order, HUD shall submit a detailed plan for achieving full compliance within 30 days with this

Court's Order. This plan shall indicate by individual apartments what steps are required and a schedule for achieving compliance. Any failure to act in good faith in accordance with this directive will require immediate sanctions.

The motion to dismiss and the motion for a partial stay of the preliminary injunction are denied. Defendants shall submit a plan for compliance within seven days.

So ordered.