# ALEXANDER ET AL. v. UNITED STATES DEPART-MENT OF HOUSING AND URBAN DEVELOPMENT ET AL.

No. 77–874. Argued December 5, 1978—Decided April 17, 1979*

_____

*Together with No. 77–1463, *Harris, Secretary of Housing and Urban Development, et al.* v. *Cole et al.*, on certiorari to the United States Court of Appeals for the District of Columbia Circuit.

40

MARSHALL, J., delivered the opinion for a unanimous Court.

*John Vanderstar* argued the cause for petitioners in No. 77–874 and for respondents in No. 77–1463. With him on the briefs were *Theodore Voorhees, Jr., Richard L. Zweig, Paul Levy,* and *Florence Wagman Roisman.*

*William C. Bryson* argued the cause for respondents in No. 77–874 and petitioners in No. 77–1463. With him on the brief were *Solicitor General McCree, Assistant Attorney General Moorman, Deputy Solicitor General Barnett, Jacques B. Gelin,* and *Robert L. Klarquist.*

Mr. Justice Marshall delivered the opinion of the Court.

These cases require us to interpret the definition of a "displaced person" set forth in the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970 (Relocation Act), 84 Stat. 1894, 42 U. S. C. § 4601 et seq. Section 101 (6) of the Act defines a "displaced person" as

> "any person who . . . moves . . . as a result of the acquisition of . . . real property, . . . or as the result of the written order of the acquiring agency to vacate real property, for a program or project undertaken by a Federal agency . . . ." 42 U. S. C. § 4601 (6).[1]

---

[1] Section 101 (6) provides in its entirety:

"The term 'displaced person' means any person who, on or after the effective date of this Act, moves from real property, or moves his personal property from real property, as a result of the acquisition of such real property, in whole or in part, or as the result of the written order of the acquiring agency to vacate real property, for a program or project undertaken by a Federal agency, or with Federal financial assistance; and solely for the purposes of sections 202 (a) and (b) and 205 of this title, as a result of the acquisition of or as the result of the written order of the acquiring agency to vacate other real property, on which such person conducts a business or farm operation, for such program or project." 84 Stat. 1894, 42 U. S. C. § 4601 (6).

Section 101 (5) of the Act defines a "person" to mean "any individual, partnership, corporation, or association." 84 Stat. 1894, 42 U. S. C. § 4601 (5).

The definition of a "displaced person" governs basic eligibility for the several types of assistance available under the Relocation Act. Section 202 of the Act provides reimbursement for reasonable moving expenses, direct losses that result from moving or discontinuing a business or farm operation, and expenses incurred in searching for a replacement business or farm. In lieu of reimbursement for actual expenses, § 202 authorizes payment of a fixed sum to eligible persons, here a $300 moving expense allowance and a $200 dislocation allowance. 84 Stat. 1895, 42 U. S. C. § 4622; see 24 CFR §§ 42.65–42.80 (1978); infra, at 60. Sections 203 and 204 permit replacement housing payments of up to $15,000 for homeowners and $4,000 for tenants, provided certain need and occupancy requirements are satisfied. 84 Stat. 1896, 1897, 42 U. S. C. §§ 4623, 4624;

Relocation benefits are available under the Act for individuals and businesses that satisfy either the "acquisition" or "written order" clause of this definition. Because the Courts of Appeals for the Seventh and District of Columbia Circuits have adopted conflicting interpretations of the written order clause,[2] we granted certiorari. 437 U. S. 903 (1978).

Both cases involve housing projects that the Department of Housing and Urban Development (HUD) acquired after the projects' sponsors defaulted on federally insured loans. We must determine whether the written order clause encompasses the tenants required to vacate those housing projects, even though HUD's orders to vacate were not motivated by a governmental acquisition of property to further a public program or project.

## I

### A

Petitioners in No. 77–874 are 17 former tenants of the Riverhouse Tower Apartments, a low- and middle-income housing project in Indianapolis, Indiana. This complex was built in the late 1960's by a private nonprofit corporation, Riverhouse Apartments, Inc., whose mortgage HUD insured and subsidized pursuant to § 221 (d)(3) of the National Housing Act, 75 Stat. 150, as amended, 12 U. S. C. § 1715l (d)(3). Upon completion of the project, the Government National Mortgage Association (GNMA) purchased the mortgage from

---

see 24 CFR §§ 42.90, 42.95 (1978); *infra*, at 61. Finally, § 205 requires agencies to establish a program of relocation assistance advisory services for displaced persons. 84 Stat. 1897, 42 U. S. C. § 4625; see 24 CFR §§ 42.100–42.125 (1978); *infra*, at 60.

[2] 555 F. 2d 166 (CA7 1977); 187 U. S. App. D. C. 156, 571 F. 2d 590 (1977). See also *Blount* v. *Harris*, 593 F. 2d 336 (CA8 1979); *Burns* v. *United States*, Civ. No. 4–76–237 (DC Minn., July 11, 1978). See generally *Harris* v. *Lynn*, 555 F. 2d 1357, 1359–1360 (CA8) (aff'g 411 F. Supp. 692 (ED Mo. 1976)), cert. denied, 434 U. S. 927 (1977); *Caramico* v. *Secretary, Dept. of HUD*, 509 F. 2d 694, 697–699 (CA2 1974).

the private lender in accordance with § 221 (d)(3) of the Housing Act. When Riverhouse Apartments, Inc., defaulted on the loan in July 1970, GNMA assigned the mortgage to HUD in exchange for payment of the statutory mortgage benefits. Three years later, HUD initiated foreclosure proceedings, and a court-appointed receiver assumed operation of the project until HUD purchased the property at a foreclosure sale in August 1974.

HUD initially retained a management agent to continue operating the newly acquired project. However, the condition of the property had deteriorated so seriously during the period of default that HUD soon decided to close the apartment complex. Notices to quit were served on all remaining tenants in November 1974, and by the following February, the buildings were vacant. HUD refused to provide relocation benefits for these dislocated tenants or to disclose its plans regarding the terminated project.[3]

Petitioners then initiated this action in Federal District Court, claiming, *inter alia*, that they were "displaced persons" entitled to assistance under the Relocation Act.[4] Construing the written order clause of § 101 (6) literally, the tenants argued that they had moved upon receiving written orders to vacate property acquired by a Government agency. The District Court rejected this statutory construction and granted summary judgment for HUD. *Blades* v. *Dept. of HUD,* Civ. No. IP 74–706–C (SD Ind., July 1, 1976). The Court of Appeals for the Seventh Circuit affirmed. In its view, § 101 (6) encompasses only displacements for programs designed to ben-

---

[3] It now appears that a private party contracted in July 1977 to purchase Riverhouse Towers Apartments from HUD and that the sale has since been consummated. Brief for Petitioners in No. 77–874, pp. 37–38 (letter from Department of HUD, Office of General Counsel, to Mr. Richard L. Zweig).

[4] The tenants sought judicial review under the Administrative Procedure Act, 5 U. S. C. § 701 *et seq.,* of HUD's refusal to provide relocation assistance. Jurisdiction was predicated on 28 U. S. C. §§ 1337, 1346.

efit the public as a whole or to fulfill a public need, not dislocations caused by the irretrievable failure of a public housing project. 555 F. 2d 166, 169–170 (1977).[5]

## B

The tenants in No. 77–1463 formerly occupied the Sky Tower apartment complex built in Washington, D. C., during the 1950's. A nonprofit corporation purchased Sky Tower in 1970, intending to convert a number of its small "garden" apartments into larger units for low- and moderate-income families. HUD agreed to assist in the rehabilitation by insuring the corporation's mortgage on the complex and subsidizing its interest payments, pursuant to § 236 of the National Housing Act, 82 Stat. 498, as amended, 12 U. S. C. § 1715z–1. Difficulties with two successive general contractors eventually prevented the corporate sponsor from making interest payments on its loan. As a result, the mortgagee declared the sponsor in default, foreclosed on the mortgage, and conveyed title to HUD in exchange for the statutory mortgage insurance benefits. See 12 U. S. C. §§ 1713 (g), (k).

After acquiring title to Sky Tower in June 1973, HUD hired a management agent to continue operating the partially rehabilitated complex. By September 1974, however, HUD realized that Sky Tower's deteriorated condition would render any further efforts at rehabilitation futile. The agency therefore planned to demolish the buildings and sell the land to private developers for construction of single-family homes.

---

[5] In addition to their Relocation Act claims, several tenants alleged in the complaint that HUD should not have applied their security deposits to offset rent deficiencies. The tenants contended that HUD had breached an implied warranty of habitability for the relevant period, thereby relieving them of any obligation to pay rent. Deciding the issue under federal law, the District Court held that no such warranty could be implied in the tenants' leases. The Court of Appeals affirmed. 555 F. 2d, at 170–171. The tenants have not challenged this aspect of the Court of Appeals' decision, and we therefore do not consider the issue.

46

When the 72 families living in the complex were ordered to vacate, HUD declined to extend assistance under the Relocation Act.[6]

A group of the Sky Tower tenants brought this suit in Federal District Court, challenging HUD's decision to raze the complex and its refusal to provide full relocation benefits. The District Court preliminarily enjoined HUD from completing the demolition, and subsequently granted summary judgment for the tenants on the benefits issue. Civ. Action No. 74–1872 (DC, Sept. 12, 1975).[7] A divided panel of the Court of Appeals for the District of Columbia Circuit agreed that these tenants were "displaced persons" under the written order clause of § 101 (6). 187 U. S. App. D. C. 156, 161, 571 F. 2d 590, 595 (1977). In so ruling, the Court of Appeals rejected HUD's argument that § 101 (6) reaches only persons dislocated by an agency's purposeful acquisition of property for use in certain types of government programs. The court instead considered the written order clause applicable whenever an agency orders persons to vacate so that property can be devoted to a federal program " 'designed for the benefit of the public as a whole.' " 187 U. S. App. D. C., at 161, 571

---

[6] Although HUD did provide minimal reimbursement for moving expenses, it made these $300 payments on an emergency basis "under the general authority of the Housing Act," and not pursuant to any provision of the Relocation Act. Tr. of Oral Arg. 30.

[7] The preliminary injunction barred HUD from completing the demolition or the evictions, required the agency to rehabilitate certain buildings, and allowed the evicted tenants to return at the Department's expense. *Cole* v. *Lynn,* 389 F. Supp. 99 (DC 1975); *Cole* v. *Hills,* 396 F. Supp. 1235 (DC 1975). While the benefits issue was pending on appeal pursuant to Fed. Rule Civ. Proc. 54 (b), the parties agreed that the District Court should remand the remaining issues to HUD, so the agency could reconsider the proper disposition of Sky Tower. On remand, the agency abandoned the demolition plan and arranged to transfer ownership of the housing complex to the District of Columbia government, with HUD continuing to provide substantial rent subsidies. 187 U. S. App. D. C., at 160 n. 17, 571 F. 2d, at 594 n. 17.

F. 2d, at 595. In the court's view, HUD's demolition plan met this description. *Ibid.*[8]

## II

Section 101 (6) of the Relocation Act, as previously indicated, provides that a "displaced person" is one who moves "as a result of the acquisition of . . . real property, . . . or as the result of the written order of the acquiring agency to vacate real property, for a program or project undertaken by a Federal agency . . . ." 42 U. S. C. § 4601 (6). In neither case do the tenants claim coverage under the "acquisition" clause of § 101 (6), which reaches persons dislocated by the actual procurement of property for a federal program or project. Brief for Respondents in No. 77–1463, p. 15, and n. 17; Tr. of Oral Arg. 10. Hence, these tenants' eligibility for relocation assistance turns on the meaning of the definition's written order clause. More precisely, their eligibility depends on the import of two critical phrases not specifically defined in the Act, "acquiring agency" and "for a program or project."

The tenants contend that "acquiring agency" simply denotes a governmental body that has previously acquired property and that eventually orders persons to vacate. In contrast, HUD reads the phrase as a shorthand description of an agency currently engaged in the process of acquiring property. Under HUD's construction, the written order clause contains an implicit acquisition requirement. The clause thus construed does not apply unless an agency's proposed acquisition of property

---

[8] After we granted certiorari in these cases, Congress enacted the Housing and Community Development Amendments of 1978, Pub. L. 95–557, 92 Stat. 2080. That legislation directs HUD to re-examine its property management and disposition program, see § 203, 92 Stat. 2088, 12 U. S. C. § 1701z–11 (1976 ed., Supp. II); § 902, 92 Stat. 2125, and to ensure that tenants displaced from property owned by HUD will receive any relocation assistance available under other statutory provisions, § 203 (d). However, these provisions do not affect the Relocation Act's definition of a "displaced person." See H. R. Conf. Rep. No. 95–1792, pp. 67–71, 99–100 (1978).

directly causes issuance of the displacing order, whereas the tenants' interpretation demands no immediate causal connection between the procurement of property and the order to vacate.

The parties also disagree about the proper referent for the phrase, "for a program or project." [9] HUD contends that this phrase modifies the acquisition requirement included in the written order clause. Consequently, "for a program or project" specifies the agency's original purpose in acquiring property, not just its purpose in issuing an order to vacate. Under this construction, the written order clause applies only if an agency issues its notice to vacate pursuant to an actual or proposed acquisition of property intended to further a federal program. Thus, tenants of a housing project acquired by the Government because of the owner's loan default would not be eligible for relocation assistance when the acquiring agency later adopts a program necessitating their displacement.

The tenants, on the other hand, read "for a program or project" as referring solely to the written order. The phrase therefore identifies the agency's reason for ordering persons to vacate, but does not make eligibility depend on the agency's

---

[9] In its entirety, this phrase encompasses any "program or project undertaken by a Federal agency, or with Federal financial assistance." § 101 (6), 42 U. S. C. § 4601 (6). Lower federal courts have interpreted the latter part of this phrase to include only federally assisted "programs or projects" undertaken by agencies of state and local governments, as opposed to private parties. See *Moorer* v. *Dept. of HUD,* 561 F. 2d 175 (CA8 1977), cert. denied, 436 U. S. 919 (1978); *Dawson* v. *U. S. Dept. of HUD,* 428 F. Supp. 328 (ND Ga. 1976); *Parlane Sportswear Co.* v. *Weinberger,* 381 F. Supp. 410 (Mass. 1974), aff'd, 513 F. 2d 835, 837 (CA1), cert. denied, 423 U. S. 925 (1975). Although the present cases do require us to consider what types of "programs or projects" Congress intended to cover, *infra,* at 63–67, we need not determine whether § 101 (6) applies when private parties undertake such a program and acquire property, since the tenants here have claimed that the program of a federal agency caused their displacement. Similarly, these cases do not require us to construe the provisions applicable when a state or local agency acquires property for use in a covered program or project. See 42 U. S. C. §§ 4627–4633, 4635.

original purpose in acquiring the property. According to this analysis, the written order clause covers any individual who receives a written order to vacate property that an agency has previously acquired, provided the *displacement* is "for" a federal program or project. Moreover, the tenants broadly construe "program or project" to include any governmental program designed to fulfill a public need.

The statutory language is susceptible of either construction. However, an examination of Congress' purpose in adopting the Relocation Act, the legislative history of § 101 (6), and the structure of the Act as a whole persuades us that HUD's interpretation more nearly reflects the intended scope of this assistance program.

## A

Passage of the Relocation Act in 1970 concluded nearly a decade of congressional effort to standardize federal legislation regarding relocation assistance. Prior to the 1960's, Congress had enacted special provisions to assist persons displaced when particular federal agencies acquired property for designated public projects.[10] As a result, relocation benefits varied substantially from program to program. The House Public Works Committee responded to these variations in 1961 by creating the Select Subcommittee on Real Property Acquisition. In 1964, this Subcommittee submitted a lengthy Report concerning the deficiencies of existing law, and its proposed "Fair Compensation Act" became the basis for most of the provisions ultimately codified in the Relocation Act.[11]

---

[10] See, *e. g.*, Tennessee Valley Authority Act of 1933, ch. 32, 48 Stat. 58, as amended, 49 Stat. 1080; Act to Authorize Certain Construction of Military and Naval Installations, Pub. L. 82–155, § 501 (b), 65 Stat. 364; Act of May 29, 1958, Pub. L. 85–433, 72 Stat. 152, 43 U. S. C. § 1231 (1964 ed.), repealed by uncodified § 220 (a) (1) of the Relocation Act, 84 Stat. 1903.

[11] Select Subcommittee on Real Property Acquisition of the House Committee on Public Works, Study of Compensation and Assistance for

The proposed Fair Compensation Act unambiguously reflects Congress' limited purpose in revising the special relocation legislation. The Act's declared purpose was to afford "persons affected by the *acquisition of real property in Federal* and federally assisted *programs* . . . fair and equitable treatment on a basis as nearly uniform as practicable." Select Subcommittee Study 147 (emphasis added); see *id.,* at 1–2, 122. This statement of policy embodied Congress' recognition that existing law provided relocation benefits only to those persons dislocated by governmental acquisitions of property for use in public projects.[12] And in accord with its mandate, the Select Subcommittee drafted the replacement legislation to standardize and improve the assistance provided within that particular context.[13] Thus, both the language and origins of the Relocation Act demonstrate that Congress initially intended to provide better relocation assistance when property is acquired for federal programs, not to extend assistance beyond that limited context to all persons somehow displaced by governmental programs.[14]

---

Persons Affected by Real Property Acquisition in Federal and Federally Assisted Programs, 88th Cong., 2d Sess., 145–167 (Comm. Print 1965) (hereinafter Select Subcommittee Study).

[12] See *id.,* at 93–104, 194–207. The sole exception to this pattern was contained in § 310 of the Housing Act of 1964, 78 Stat. 788, 42 U. S. C. § 1465 (1970 ed.), repealed by uncodified § 220 (a)(5) of the Relocation Act, 84 Stat. 1903. Section 310 extended benefits to persons displaced from urban renewal areas by code enforcement activities and by programs of voluntary rehabilitation in accordance with an urban renewal plan. Congress treated this provision as an exception to the general rule when it drafted the Fair Compensation Act and the successor bills. See *infra,* at 61–62, and nn. 20, 40.

[13] See *infra,* at 53, and n. 20.

[14] The tenants contend that Congress legislated against a broader background and therefore must have intended the Fair Compensation Act and the Relocation Act to apply outside the acquisition context. For support, they rely on § 123 of the Housing Act of 1954, 68 Stat. 596, 599–600,

Congress' basic objective remained unchanged through succeeding legislative sessions as it considered a number of bills derived from the proposed Fair Compensation Act. During this period, the individual sponsors and the Senate Committee on Government Operations altered slightly the language used to declare Congress' purpose, but the meaning was unaffected.[15] Thus, the original "Declaration of Policy" in S. 1, 91st Cong., 1st Sess., § 201 (1969), the bill finally enacted as the Relocation Act, stated that the legislation was designed

> "to establish a uniform policy for the fair and equitable treatment of owners, tenants, and other persons *displaced by the acquisition of real property in Federal* and federally assisted *programs* to the end that such persons shall not suffer disproportionate injuries as a result of programs designed for the benefit of the public as a whole." (Emphasis added.)

This language leaves little doubt that Congress' concern was

---

as amended, 12 U. S. C. §§ 1715k, 1715*l*, which facilitated the relocation of displaced individuals yet did not depend on the acquisition of property for a federal project. However, § 123 was not in any sense a relocation benefits statute, but rather an aspect of the mortgage insurance program designed to encourage the development of housing for families displaced by governmental action. See 68 Stat. 599. Section 123 therefore was merely tangential to Congress' immediate goal of revising legislation that directly assisted dislocated persons. Accordingly, the proposed Fair Compensation Act did not include § 123 among the provisions to be repealed upon adoption of the replacement legislation. See Select Subcommittee Study 159.

[15] See S. 1201, 89th Cong., 1st Sess., § 2 (1965); S. 1681, 89th Cong., 1st Sess., § 2 (1965); S. Rep. No. 1378, 89th Cong., 2d Sess., 1 (1966); S. 698, 90th Cong., 1st Sess., § 801 (1967) (as introduced); S. 698, 90th Cong., 2d Sess., § 701 (1968) (as reported by Committee); S. Rep. No. 1456, 90th Cong., 2d Sess., 11, 24 (1968). Congress' failure to enact comprehensive relocation legislation until 1970 was due not to any dispute over the purpose of the bills, but rather to the inability of both Houses to complete action before the end of the earlier legislative sessions. See S. Rep. No. 91–488, pp. 4–7 (1969); 116 Cong. Rec. 40168 (1970) (Rep. Fallon).

still with displacements caused by the acquisition of property for a Government program or project.[16]

In arguing that Congress had a broader purpose, to provide relocation assistance outside the acquisition context, the tenants rely on language adopted by the House of Representatives after the Senate passed S. 1. When the House Committee on Public Works reorganized and shortened the bill's provisions into their final form, it also streamlined the "Declaration of Policy" by deleting the references to acquisitions of property. Consequently, § 201 of the Relocation Act simply refers to "persons displaced as a result of Federal and federally assisted programs," [17] and the tenants suggest that all such persons are the intended beneficiaries of the statute. However, the tenants' interpretation of this language is plainly inconsistent with prior versions of the section, all of which expressly related to displacements caused by the acquisition of property for the programs specified in § 201.[18] Nothing in the legislative materials suggests that this late revision in the Act's statement of purpose reflected any substantive departure from Congress' previous statutory design.[19] Indeed, the House Committee that shortened the Declaration of Policy stated in its Report that the bill "provides for relief of the economic

---

[16] See also the Senate Committee's description of the purpose for this legislation, S. Rep. No. 91–488, pp. 10, 13 (1969), and the discussion of this bill on the Senate floor. 115 Cong. Rec. 31370–31376, 31533–31535 (1969).

[17] Section 201 declares:

"The purpose of this title is to establish a uniform policy for the fair and equitable treatment of persons displaced as a result of Federal and federally assisted programs in order that such persons shall not suffer disproportionate injuries as a result of programs designed for the benefit of the public as a whole." 84 Stat. 1895, 42 U. S. C. § 4621.

[18] See n. 15, *supra*.

[19] See H. R. Rep. No. 91–1656 (1970); 116 Cong. Rec. 40163–40172 (1970) (House debate); *id.*, at 42139 (Senate acceptance of House modifications); *id.*, at 42506–42507 (final House approval).

dislocation which occurs in the acquisition of real property for Federal and federally assisted programs." H. R. Rep. No. 91–1656, p. 3 (1970). Accordingly, the consistent purpose underlying this legislation persuades us that Congress intended the written order clause to apply only when an agency proposes acquiring property to further a federal program or project.

B

The legislative history specifically concerning the definition of a displaced person reinforces our conclusion. Prior versions of § 101 (6) encompassed only persons dislocated by actual or proposed property acquisitions, and in particular, those acquisitions intended to further federal programs and projects. The legislative materials demonstrate that when Congress added the written order clause to this definition, its purpose was to delineate more precisely a subcategory of the originally intended beneficiaries, consisting of those who move in anticipation that a property acquisition for a federal program will necessitate their displacement. Viewed in context, the written order clause addresses a special situation related to unconsummated property acquisitions, not all displacements loosely connected with Government programs.

The definition of a displaced person originated in the proposed Fair Compensation Act. Section 115 defined the term to include persons and businesses that move from real property "as a result of the acquisition or imminence of acquisition of such real property, in whole or in part, by a Federal or State agency." Select Subcommittee Study 157–158. That this choice of language was deliberate can be seen from other provisions of the Act, which authorized relocation assistance only when the "head of any Federal agency acquires real property for public use." [20]

[20] Sections 107 and 108 of the Fair Compensation Act, Select Subcommittee Study 151–152. In addition to these operative sections of the proposed Act, the special benefits provision contained in § 113 of the Act re-

The version of the Fair Compensation Act introduced in the next Congress adopted the same definition of a displaced person.[21] However, witnesses during the Senate hearings criticized the phrase "or imminence of acquisition" as too ambiguous to provide guidance for agencies and potential displacees.[22] In response, the Senate Committee on Government Operations amended the phrase to read "or reasonable expectation of acquisition," thereby incorporating an objective standard of eligibility.[23] The limited scope of this amend-

flected the limited scope of the term "displaced person." Section 310 of the Housing Act of 1964 provided relocation assistance in a few situations not involving governmental property acquisitions. See n. 12, *supra*. In recognition that beneficiaries of this program would not be "displaced persons" under the Fair Compensation Act, the Select Subcommittee included a special provision to preserve this program when the existing relocation legislation was repealed. The special benefits provision, § 113 of the proposed Act, directed that persons who move "as the direct result of code enforcement activities undertaken in connection with an urban renewal project, or a program of voluntary rehabilitation of buildings or other improvements in accordance with an urban renewal plan" shall be deemed "displaced person[s]." Select Subcommittee Study 157.

That similar provisions were included in subsequent Senate bills demonstrates that Congress intentionally restricted the definition of a "displaced person" to application in the property acquisition context. See S. 1201, 89th Cong., 1st Sess., § 113 (1965); S. 1681, 89th Cong., 1st Sess., § 10 (1965); S. Rep. No. 1378, 89th Cong., 2d Sess., 8, 32–33 (1966); S. 698, 90th Cong., 1st Sess., § 808 (1967); S. Rep. No. 1456, 90th Cong., 2d Sess., 32 (1968); S. 1, 91st Cong., 1st Sess., § 232 (1969); n. 40, *infra*. This provision was ultimately enacted as § 217 of the Relocation Act, 84 Stat. 1902, 42 U. S. C. § 4637. See *infra*, at 61–62.

[21] S. 1681, 89th Cong., 1st Sess., § 12 (2) (1965); see also S. 1201, 89th Cong., 1st Sess., § 115 (2) (1965).

[22] Hearings on S. 1201 and S. 1681 before the Subcommittee on Intergovernmental Relations of the Senate Committee on Government Operations, 89th Cong., 1st Sess., 55, 90 (1965).

[23] S. 1681, 89th Cong., 1st Sess., § 11 (b) (July 20, 1966). The Senate Committee substituted this language as well in the bill's definition of "displaced," since the Senate bill and its successors also employed this term to impose the same eligibility requirements as the definition of a "displaced person." See *id.*, § 11 (m); n. 31, *infra*.

ment, as well as the definition, is apparent from the Committee's explanation that the change was designed

> "to remove some of the ambiguities surrounding the meaning of 'imminence' and to make it amply clear that this legislation applies to persons who move from property to be acquired in connection with a Federal or federally assisted program when or shortly after the proposed project is announced, and when the announcement is made substantially prior to the time the project is to be put into effect." S. Rep. No. 1378, 89th Cong., 2d Sess., 9 (1966).

This passage and others in the Senate Committee Report [24] clearly indicate that Congress framed the definition to reach only persons displaced by actual or planned acquisitions of property. These materials also demonstrate that Congress restricted the definition even further by focusing exclusively on property acquisitions for use in federal programs and projects.[25]

The Senate's amended definition of a displaced person was retained in the relocation bills proposed in succeeding legislative sessions, including the original version of the bill finally enacted as the Relocation Act, S. 1, 91st Cong., 1st Sess., § 105 (1969).[26] The Senate passed this bill with only minor amendments and without significant debate.[27] But the House Committee on Public Works amended the definition of a

---

[24] See, e. g., S. Rep. No. 1378, 89th Cong., 2d Sess., 1 (1966) ("The purpose of S. 1681, as amended, is to establish a uniform policy for the fair and equitable treatment of owners, tenants, and other persons displaced by the acquisition of real property for Federal and federally assisted programs").

[25] Id., at 1, 9, 10–11, 17, 26, 30; 112 Cong. Rec. 16733, 16735, 16737–16740 (1966).

[26] S. 698, 90th Cong., 1st Sess., § 113 (1967) (as introduced); id., § 112 (as reported by Committee). See also n. 29, infra.

[27] S. Rep. No. 91–488 (1969); 115 Cong. Rec. 31370–31376, 31533–31535 (1969).

displaced person when reorganizing the bill's provisions into their final form.[28] This late amendment added the clause on which the tenants base their argument that relocation assistance was intended for all persons displaced by Government programs.

The contemporaneous legislative materials, however, refute the tenants' interpretation of the written order clause. During the House hearings on the relocation bills, a number of witnesses criticized even the "reasonable expectation of acquisition" language as overly vague.[29] To remedy this problem, representatives of the United States Department of Transportation and HUD recommended relating the expectation of acquisition to a readily discernible official act, so that persons who justifiably relied on agency representations could still obtain reimbursement even if the agency later failed to complete the acquisition.[30] The House Committee accepted this suggestion and replaced "or reasonable expectation of acquisition" with "or as the result of the written order of the

---

[28] H. R. Rep. No. 91–1656, pp. 4–5 (1970); S. 1, 91st Cong., 2d Sess., § 101 (6) (Dec. 2, 1970).

[29] Uniform Relocation Assistance and Land Acquisitions Policies—1970: Hearings on H. R. 14898, H. R. 14899, S. 1 and Related Bills before the House Committee on Public Works, 91st Cong., 1st and 2d Sess., 137, 281, 416, 595–596, 1028 (1969–1970) (hereinafter 1970 House Hearings). Some witnesses suggested that S. 1 be amended by adding a "subsequent acquisition" requirement to the definition of a displaced person. 1970 House Hearings 137, 281–282, 416. The subsequent acquisition language would have precluded awarding any relocation assistance when an agency failed to consummate an acquisition, no matter how reasonable the expectation of acquisition had been. This suggestion was based on the definition used in H. R. 14898, 91st Cong., 1st Sess. (1969), a companion relocation proposal, which in turn was derived from the Highway Relocation Assistance provisions of the Federal-Aid Highway Act of 1968, § 30, 82 Stat. 830, repealed by uncodified § 220 (a) (10) of the Relocation Act, 84 Stat. 1903.

[30] The Department of Transportation's representative testified:

"We think some limitation [on the expectation of acquisition] is desirable. Relocation payments should be limited to persons actually displaced

acquiring agency to vacate real property." [31] Thus, the sole objective underlying the present written order clause was to delineate more precisely the persons eligible for assistance as a result of planned, but unconsummated, acquisitions of property for federal programs.

The House Committee Report and floor debate also reflect this limited purpose. Based on the previously understood scope of this legislation and on testimony given during the House hearings,[32] the House Committee was well aware that

or who move due to some official act of the public authorities such as a notice of condemnation." 1970 House Hearings 596.

The representative from HUD agreed, recommending that:

"Relocation payments should not be made to those who move on the basis of speculation regarding the intent to take their property. We favor a provision limiting reimbursement to persons [who move] after some official act which clearly threatens displacement even though the property is never subsequently acquired." *Id.*, at 1027–1028.

Both representatives referred the House Committee to their own agencies' relocation regulations, which based eligibility for benefits on the occurrence of an "official act" before the actual acquisition. *Id.*, at 1007, 1069.

[31] S. 1, 91st Cong., 2d Sess., § 101 (6) (Dec. 2, 1970), enacted as 42 U. S. C. § 4601 (6). The House Committee also consolidated all of S. 1's subcategories of "displaced persons" into one provision, § 101 (6), along with the definition of "displaced." This consolidation did not affect language pertinent to the issues raised here.

[32] Several witnesses remarked that the unamended definition of a displaced person would exclude those dislocated by activities other than property acquisitions. 1970 House Hearings 234, 241, 252–253, 270, 350–351, 360. Many of these comments were directed in particular toward H. R. 14898, which did not contain a provision continuing the availability of benefits for persons displaced by code enforcement activities and rehabilitation in urban renewal projects. See n. 12, *supra.* A few witnesses recommended that the House Committee rectify the omission by adding a provision similar to that contained in the Fair Compensation Act, see n. 20, *supra,* or the S. 1 provision that later became § 217 of the Relocation Act. 1970 House Hearings 234, 241, 252–253, 270. Other witnesses proposed a more general expansion to cover persons displaced in the absence of an acquisition. *Id.*, at 350–351, 360. All of these witnesses,

the unamended definition of a displaced person excluded those displaced by means other than property acquisitions for public projects. The Committee presumably would have articulated any intent to extend coverage beyond the acquisition context or to eliminate the requirement that an acquisition be for a federal program.[33] Instead, the House Report simply explained that under the new written order clause, "[i]f a person moves as the result of such a notice to vacate, it makes no difference whether or not the real property *actually* is acquired." H. R. Rep. No. 91–1656, p. 4 (1970) (emphasis added).[34] Similarly, the Report observed in reference to the entire definition of a displaced person, "[t]he controlling point is that the real property must be acquired for a Federal or Federal financially assisted program or project." *Ibid.*[35]

---

however, agreed that given the language used to define a displaced person, an additional provision was needed to accomplish these extensions.

[33] This principle is especially applicable here, since witnesses had advocated such a wide range of adjustments in coverage. One group urged that coverage not be available unless property was actually acquired, see n. 29, *supra,* while another group requested the Committee to authorize relocation benefits generally outside the acquisition context. See n. 32, *supra.* The lack of any evidence that the Committee intended to accept either suggestion strongly indicates that the written order clause was designed solely to eliminate the vagueness inherent in the prior definition.

[34] The tenants contend that the written order clause cannot in fact serve the purpose urged by HUD, because only an agency that already has acquired property is empowered to "order" persons to move from the property. This argument attributes too much significance to the word "order." As shown by the passage quoted in text, the Committee generally referred to a "notice to vacate." The Committee's description of the clause, as well as its origin, demonstrates that a "written order" indicates any official notice to vacate, whether issued before or after the acquisition is completed. See also S. Rep. No. 1378, 89th Cong., 2d Sess., 9 (1966).

[35] That Members of the House did not consider the new written order clause a significant departure from previous proposals is evident from their specific characterizations of the bill during the brief House debate as legislation designed to provide benefits when persons are displaced by the acquisition of property for public programs. See 116 Cong. Rec. 40167

Nor is there any evidence that the Senate perceived the written order clause as an expansion of the bill when it accepted the House Committee's changes without a conference and almost without debate. 116 Cong. Rec. 40163–40172 (1970). The sole reference during the Senate deliberations to the amended definition of a "displaced person" appeared in a memorandum submitted on behalf of the administration, which stated:

> "The House bill would limit the status of displaced person to those who move as the result of the acquisition of, or written notice to vacate, real property. The Senate version would provide a broader definition which includes those who move as the result of acquisition or reasonable expectation of acquisition." *Id.,* at 42139.

This description of the amendment as a slight limitation, rather than a significant expansion of the statutory design, was accepted without dispute when the Senate approved the House version of this section as the final language for the Relocation Act. *Ibid.*

In sum, the legislative history of the written order clause reveals no congressional intent to extend relocation benefits beyond the acquisition context. Rather, this clause merely ensures that assistance is available for a distinct group of persons directed to move because of a contemplated acquisition, whether the agency ultimately acquires the property or not. The written order clause therefore preserves the original meaning of a displaced person, since it does not apply unless a proposed acquisition directly causes issuance of the notice to vacate and the property acquisition is intended to further a federal program or project.

---

(1970) (Rep. Edmondson); *id.,* at 40169 (Rep. Cleveland); *id.,* at 40170 (Rep. Johnson); *id.,* at 40171 (Rep. Brotzman); *id.,* at 40171–40172 (Rep. Annunzio). See also *id.,* at 42506 (Rep. Edmondson); *id.,* at 42507 (Rep. Hall).

## C

The structure of the Relocation Act confirms our conclusion that Congress did not expect to provide assistance for all persons somehow displaced by Government programs. The benefit provisions involved here are but one part of a comprehensive statute that also establishes the procedures agencies must follow when acquiring land for federal programs. See 42 U. S. C. §§ 4651–4655. This placement in itself suggests that Congress was concerned with burdens related to Government acquisitions of property, as opposed to a broader range of dislocation problems. But more importantly, the Act's other relocation sections, which specify the benefits available for displaced persons, manifest the limited scope of § 101 (6) and the written order clause.

Sections 202 and 205 of the Act require respectively that moving and related expenses be paid and relocation assistance advisory services be provided for displaced persons only when an agency proposes acquiring property for a federal program. See n. 1, *supra*. Thus, § 202 begins:

> "Whenever the acquisition of real property for a program or project undertaken by a Federal agency in any State will result in the displacement of any person . . . the head of such agency shall make a payment to any displaced person, upon proper application . . . ." 84 Stat. 1895, 42 U. S. C. § 4622.

Identical language triggers application of § 205. 84 Stat. 1897, 42 U. S. C. § 4625. If the tenants' broad construction of the written order clause were correct, certain individuals would qualify as displaced persons within the meaning of § 101 (6), but the lack of an acquisition would preclude them from receiving benefits under §§ 202 and 205. Absent any indication that Congress intended such an anomalous result, we believe all three provisions must be given similar scope.[36]

---

[36] In contrast, §§ 202 and 205 do function properly if the written order

Sections 203 and 204 of the Act, which authorize replacement housing payments for dislocated homeowners and tenants, see n. 1, *supra,* also bear upon interpretation of the written order clause. These sections provide benefits only to displaced persons who occupied their dwelling for a prescribed length of time "prior to the initiation of negotiations for the acquisition of the property." 42 U. S. C. § 4623 (a)(1).[37] Congress drafted these occupancy requirements to exclude from coverage persons who otherwise might attempt to obtain substantial relocation benefits by moving onto property after the acquisition process has begun.[38] Yet according to the tenants' analysis of § 101 (6), which requires only that an agency have procured the property at some point in the distant past, these occupancy strictures would exclude a much larger class of displaced persons than necessary to fulfill their objective. For example, tenants dislocated by the closing of a housing project that an agency had obtained 20 years earlier might satisfy the written order clause, but the failure of most to have lived in the project prior to the acquisition would prevent them from obtaining replacement housing payments under § 204. Again, we doubt Congress intended the statute to operate in this manner. Rather, §§ 203 and 204 demonstrate that the written order clause cannot be divorced from the acquisition context without distorting the statutory design.

Finally, the special benefits provision in § 217 of the Act

---

clause is given the construction compelled by its legislative history. When tenants vacate upon notice that an agency will acquire real property, "the acquisition of real property . . . will result in [their] displacement," for purposes of §§ 202 and 205, regardless of whether the agency completes its plans.

[37] Section 204 refers to "such dwelling" instead of "the property." 42 U. S. C. § 4624. The length-of-prior-occupancy requirement is 180 days for displaced homeowners and 90 days for displaced tenants. §§ 4623 (a)(1), 4624.

[38] See S. Rep. No. 91–488, pp. 10–12 (1969); H. R. Rep. No. 91–1656, pp. 8–12 (1970).

highlights the limited reach of § 101 (6). Congress drafted § 217 to preserve the one pre-existing relocation assistance program extending beyond the acquisition context.[39] This section provides:

> "A person who moves . . . as a direct result of any project or program which receives Federal financial assistance under title I of the Housing Act of 1949, as amended, or as a result of carrying out a comprehensive city demonstration program under title I of the Demonstration Cities and Metropolitan Development Act of 1966 shall . . . *be deemed to have been displaced as the result of the acquisition of real property."* 84 Stat. 1902, 42 U. S. C. § 4637 (emphasis added).

Inclusion of this special provision, to ensure that certain persons displaced by action other than an acquisition of property could still qualify for relocation benefits, reflects Congress' understanding that such persons would not be covered by the general definition of a "displaced person" set forth in § 101 (6).[40]

## D

Accordingly, we hold that the written order clause encompasses only those persons ordered to vacate in connection with the actual or proposed acquisition of property for a federal program. In essence, the clause embodies two causal requirements. First, the written order to vacate must result directly from an actual or contemplated property acquisition.[41] Sec-

---

[39] See nn. 12 and 20, *supra.*

[40] See H. R. Rep. No. 91–1656, p. 20 (1970) (This section "makes such a person eligible for the full range of relocation benefits provided for displaced persons"); S. Rep. No. 91–488, p. 15 (1969).

[41] Section 101 (6) does not, however, require that an agency anticipate obtaining title to the property. The legislative history demonstrates that Congress focused on the eventual right to use property, not on an agency's mode of procurement. For example, in explaining that benefits would be available for persons displaced by the Post Office Department's frequent

ond, and more fundamentally, that acquisition must be "for," or intended to further, a federal program or project. In combination, these two causal requirements substantially limit applicability of the written order clause, so that persons directed to vacate property for a federal program cannot obtain relocation assistance unless the agency also intended at the time of acquisition to use the property for such a program or project. Thus, a program developed after the agency procures property will not suffice, even though it necessitates displacements, since that program could not have motivated the property acquisition.[42] It remains to be considered, however, whether the relationship between HUD's acquisitions and orders to vacate brings the tenants here within the purview of § 101 (6).

### III

The tenants in both cases contend that the acquisitions of Sky Tower and Riverhouse Apartments met these statutory requirements because HUD obtained the property in connection with its mortgage insurance programs. In support of this

---

practice of using options and leasebacks in lieu of directly purchasing property for its facilities, the House Committee stated:

"It makes no difference to a person required to move because of the development of a postal facility which method the postal authorities use to obtain the facility, or who acquires the site or holds the fee title to the property. Since the end product is the same, a facility which serves the public and is regarded by the public as a public building, any person so required to move is a displaced person entitled to the benefits of this legislation." H. R. Rep. No. 91–1656, p. 5 (1970).

[42] This, of course, is not to suggest that § 101 (6) would be inapplicable if an agency acquired property for one program, expecting to displace persons, and then ultimately issued orders to vacate for a different program or project. But Congress' intent to provide relocation benefits for persons displaced in that manner does not assist the tenants here, because their eligibility depends primarily on whether HUD acquired Sky Tower and Riverhouse Apartments "for" a federal program or project in the first instance.

contention, they point to Congress' explicit provision for occasional default acquisitions resulting from the mortgage insurance programs of the National Housing Act. Section 207 (k) of that Act expressly authorizes HUD to purchase insured properties at foreclosure sales, and § 207 (*l*) grants HUD wide latitude to rehabilitate and operate property acquired upon default or to transfer the property and recoup the agency's investment. 12 U. S. C. §§ 1713 (k), (*l*). Pursuant to that mandate, HUD has prepared a Property Disposition Handbook—Multi-family Properties, RHM 4315.1 (1971), revised and set forth at 24 CFR Pt. 290 (1978), which requires responsible officials to formulate a disposition program for newly acquired properties.

However, the legislative history of the Relocation Act discussed in Part II, *supra,* demonstrates that the mere anticipation and authorization of default acquisitions in the mortgage insurance programs cannot render these tenants eligible under § 101 (6). By requiring that an acquisition be "for" a federal program or project, Congress intended that the acquisition must further or accomplish a program designed to benefit the public as a whole.[43] Even assuming that the National Housing Act mortgage insurance programs constitute federal "programs or projects,"[44] default acquisitions arising out of those pro-

---

[43] The parties have disputed whether HUD voluntarily acquired the properties here, and whether an involuntary acquisition can ever satisfy § 101 (6). But to focus on voluntariness oversimplifies application of the statute. Section 101 (6) applies whenever an agency intends to obtain property for use in a federal program, and voluntariness is relevant only to the extent it is probative of the agency's overall purpose in procuring property.

[44] Committee Reports and earlier versions of this bill elaborated on this language, by referring to an acquisition "for a public improvement constructed or developed by or with funds provided in whole or in part by the Federal Government." S. Rep. No. 91–488, p. 9 (1969); accord, S. 1, 91st Cong., 1st Sess., § 110 (1969) (as introduced and reported by Committee).

grams do not satisfy § 101 (6)'s causality requirements. These acquisitions occur as a result of the mortgage insurance programs' predictable, though unfortunate failures, but the default acquisitions do not further the purpose of these particular programs.[45] If the written order clause were satisfied by acquisitions so tangentially related to a federal program or project, then, for example, persons who default on federally insured housing loans presumably could obtain relocation assistance whenever a Government agency acquires their homes at a foreclosure sale and thereby causes displacements. Absent any evidence that Congress intended to provide relocation benefits under such circumstances, we believe typical default acquisitions are not "for" a federal program within the meaning of § 101 (6). For the same reasons, HUD's preparation of a Handbook governing the disposition of property acquired in this manner fails to qualify these tenants for relocation benefits. Like any purchaser, HUD must manage the property it acquires. But the mere adoption of a management plan cannot retroactively establish the requisite purpose for acquiring property in the first instance.

Alternatively, the tenants in No. 77–1463 contend that the particular disposition HUD planned for Sky Tower, pursuant to the Property Disposition Handbook, qualified them under the written order clause. After studying several options, HUD decided to demolish Sky Tower and sell the land to private developers who would build single-family homes, all in accordance with the District of Columbia government's master plan for improving the neighborhood. By its own admission in proceedings before the District Court, HUD proposed the demolition to "eliminate blight" in conformity with a plan to revitalize the area. 396 F. Supp. 1235, 1236 (DC 1975).

---

[45] The mortgage insurance programs were intended to facilitate "realization as soon as feasible of the goal of a decent home and a suitable living environment for every American family." 42 U. S. C. §§ 1441, 1441a; accord, 12 U. S. C. § 1701t.

These events convinced the Court of Appeals that the Sky Tower tenants had been ordered to vacate for a "program or project" within the meaning of § 101 (6). 187 U. S. App. D. C., at 161, 571 F. 2d, at 595.

The difficulty with this analysis is that even though HUD's demolition plan is the type of program or project to which § 101 (6) refers, HUD did not *acquire* Sky Tower for that purpose. The statute requires more than a causal connection between the order to vacate and the demolition program, which was all the Court of Appeals considered necessary. As explained in Part II, *supra,* the program or project must also be the reason for acquiring the property. Yet the tenants have never contended that HUD initially acquired Sky Tower in order to eliminate blight or to further the District of Columbia government's master plan, nor did the Court of Appeals or the District Court reach such a conclusion. Without the requisite relationship between the demolition program and the acquisition, HUD's proposal for disposing of Sky Tower is no different than any other property management plan, insufficient by itself to confer eligibility under § 101 (6) of the Relocation Act.

We recognize, of course, that an agency's intent in acquiring property appears irrelevant to those displaced by federal order. From a tenant's perspective, the costs of dislocation are the same regardless of whether an agency anticipated causing displacements when it acquired property. Nonetheless, Congress chose to condition eligibility for relocation benefits on the agency's purpose in acquiring property, and our function is not to rewrite the statute. The increasing number of default acquisitions by Government agencies may well prompt Congress to expand the Relocation Act's coverage.[46] But until

---

[46] See Hearings on Distressed HUD-Subsidized Multifamily Housing Projects before the Senate Committee on Banking, Housing, and Urban Affairs, 95th Cong., 1st Sess., 134–135, 250–253 (1977) (statement of Lawrence B. Simons, Assistant Secretary of HUD).

Congress does so, the tenants in these cases are ineligible for relocation assistance under that Act.

Accordingly, the judgment of the Court of Appeals in No. 77–1463 is reversed and the judgment in No. 77–874 is affirmed.

*It is so ordered.*