Audrey FRISBY, Hortense Smallwood, Gloradine Russell, Ben Randolph, Shirley A. Jones, Kay Burdett, Charles Downing, Lena Bess, and Richard Holmes, Appellants,

v.

UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT (HUD), Samuel Pierce, in his official capacity as Secretary of HUD, Walter Johnson, in his official capacity as Director of the HUD Area Office in Newark, New Jersey, John Evans, in his official capacity as Chief of the Property Disposition Branch of the HUD Area Office in Newark, New Jersey, and Frankel and Rubinson, Land Developers, Appellees.

No. 84–5034.

United States Court of Appeals,
Third Circuit.

Argued Sept. 14, 1984.

Decided Feb. 28, 1985.

Becker, Circuit Judge, dissented with opinion.

James R. Grow (argued), David B. Bryson, National Housing Law Project, Berkeley, Cal., Florence Wagman Roisman, National Housing Law Project, Washington,

D.C., Marcia Soast, Nicky Sheats, Camden Regional Legal Services, Inc., Camden, N.J., for appellants.

Mary Catherine Cuff, Asst. U.S. Atty. (argued), W. Hunt Dumont, U.S. Atty., Newark, N.J., for appellees.

Before SEITZ and BECKER, Circuit Judges, and TEITELBAUM,* District Judge.

## OPINION OF THE COURT

TEITELBAUM, District Judge.

### I.

Appellants brought a class action suit seeking to enjoin the sale of Everett Gardens by the Secretary of Housing and Urban Development (HUD) to a private developer without rehabilitation requirements and without the Section 8 Certificates attached to the sale of the project pursuant to 24 C.F.R. § 886 (1983).

Appellants alleged, among other things, that the sale violated 12 U.S.C. § 1701z–11 and the regulations promulgated pursuant thereto at 24 C.F.R. § 290.25 (1983) and 24 C.F.R. § 290.27 (1983) and therefore should be set aside in accordance with 5 U.S.C. § 706.

The district court refused to grant the injunction or to set aside the sale, whereupon this appeal ensued.

### II.

The issue before us is whether the action of the Secretary should be set aside because it was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, or because it was in excess of statutory authority.

Appellants contend that the Secretary's action of disposing of Everett Gardens without rehabilitation requirements and without Section 8 Certificates should be set

---

* The Honorable Hubert I. Teitelbaum, Chief Judge, United States District Court for the Western District of Pennsylvania, sitting by designation.

aside pursuant to 5 U.S.C. § 706(2)(A) or (C).

We disagree for the following reasons.

### III.

■ Where Congress has granted an agency discretion, the resulting decisions are subject to judicial review only to determine whether the Secretary has exceeded statutory authority or has acted arbitrarily. *See Fidelity Federal Savings and Loan Ass'n v. de la Cuesta,* 458 U.S. 141, 159, 102 S.Ct. 3014, 3024, 73 L.Ed.2d 664 (1982).

The scope of review in such situations is set forth at 5 U.S.C. § 706:

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

\* \* \* \* \* \*

(2) hold unlawful and set aside any agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

\* \* \* \* \* \*

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right. . . .

■ Agency action is entitled to a presumption of regularity. The burden of proof rests with the party alleging irregularity. *See Schweiker v. McClure,* 456 U.S. 188, 196, 102 S.Ct. 1665, 1670, 72 L.Ed.2d 1 (1982). This presumption does not, however, prevent a reviewing court from taking a probing, "hard look" at the agency's action. *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 415–416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971).

■ Agency action may not be set aside on grounds that it is arbitrary and capricious if the action is rational, based on relevant factors, and within the agency's statutory authority. *Motor Veh. Mfgrs. Ass'n. v. State Farm Mut.,* 463 U.S. 29, ——, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983).

■ In considering whether agency action is rational, a reviewing court must determine whether the agency considered the relevant data and articulated an explanation establishing a "rational connection between the facts found and the choice made." *Burlington Truck Lines v. United States,* 371 U.S. 156, 168, 83 S.Ct. 239, 246, 9 L.Ed.2d 207 (1962).

■ In considering whether agency action was based on relevant factors, the reviewing court normally must determine whether the agency relied on factors Congress intended it to consider. If the court determines that the agency relied on factors Congress did not intend for it to consider, or has failed to consider an important aspect of the problem, then the action should be set aside as arbitrary and capricious. *See Motor Vehicle Mfrs. Ass'n.,* 463 U.S. at ——, 103 S.Ct. at 2867.

■ In considering whether agency action was within the scope of its statutory authority, the reviewing court first must construe the relevant statute to determine the scope of the agency's authority and discretion and then must determine whether the action in question lies within that scope. *Overton Park,* 401 U.S. at 415–16, 91 S.Ct. at 823.

■ Finally, where, as here, judicial review includes action taken pursuant to agency regulations, validly promulgated regulations have the force of law. *Griffin v. Harris,* 571 F.2d 767, 772 (3d Cir.1978). Moreover, the agency itself is bound by its own regulations. *U.S. v. Nixon,* 418 U.S. 683, 695–696, 94 S.Ct. 3090, 3101, 41 L.Ed.2d 1039 (1974). Failure on the part of the agency to act in compliance with its own regulations is fatal to such action. *Kelly v. Railroad Retirement Board,* 625 F.2d 486, 492 (3d Cir.1980). Such actions

are "not in accordance with law."[1] *Bradley v. Weinberger*, 483 F.2d 410, 414 n. 2 (1st Cir.1973).

### IV.

The statute vesting authority in the Secretary of HUD to dispose of multifamily housing projects is set forth at 12 U.S.C. § 1701z–11(a):

It is the policy of the United States that the Secretary of Housing and Urban Development (hereinafter referred to as the "Secretary") shall manage and dispose of multifamily housing projects which are owned by the Secretary in a manner consistent with the National Housing Act and this section. The purpose of the property management and disposition program of the Department of Housing and Urban Development shall be to manage and dispose of projects in a manner which will protect the financial interests of the Federal Government and be less costly to the Federal Government than other reasonable alternatives by which the Secretary can further the goals of—

(1) preserving the housing units so that at least those units which are occupied by low-and moderate-income persons or which are vacant, at the time of acquisition, are available to and affordable by such persons;

(2) preserving and revitalizing residential neighborhoods;

(3) maintaining the existing housing stock in a decent, safe, and sanitary condition;

(4) minimizing the involuntary displacement of tenants;

(5) minimizing the need to demolish projects; and

(6) maintaining the project for the purpose of providing rental or cooperative housing.

The Secretary, in determining the manner by which a project shall be managed or disposed of, may balance competing goals in a manner which will further the achievement of the overall purpose of this section.

Subsection (a) speaks of certain "competing goals" that are relevant to determining the course of action to be taken by the Secretary with regard to a particular case. The legislative history indicates that one of these "competing goals" is the disposition of multifamily housing projects in a cost-effective manner. The others are set forth at (a)(1)–(6) and cover a variety of matters largely concerned with furtherance of certain housing-related needs.[2]

■ Subsection (a) further states that the Secretary "may balance" the above "competing goals" to "further the achievement of the overall purpose of this section." The reasonable inference to be drawn from the language of the statute and from the legislative history is that Congress has vested the Secretary with discretion in deciding in a particular case which of the above "competing goals" are to be furthered and which are not. For example, the Secretary may, in certain circumstances, choose a course of action concerning a particular multifamily housing project that is cost-effective, even though that course of action does not further the housing-related needs enumerated in the statute. 12 U.S.C. § 1701z–11(a) vests the Secretary with discretion to make such a decision.

---

1. *See* 5 U.S.C. § 706(2)(A).

2. S.Rep. No. 871, 95th Cong., 2d Sess., *reprinted in* 1978 U.S.Code Cong. & Ad.News 4773, 4796: "The goals of the program include disposition of project in a cost-effective manner in accordance with the objectives of preserving this housing for low- and moderate-income families, preserving residential neighborhoods, maintaining housing in a decent condition, minimizing displacement of tenants, and approving demolition of projects only as a last resort." *See also* H.Rep. No. 1792, 95th Cong., 2d Sess., *reprinted in* 1978 U.S.Code Cong. & Ad.News 4872, 4887: "... [T]he goals of the property management and disposition program of HUD shall be to dispose of projects in the least costly fashion while still furthering the policy objectives of: preserving housing units available and affordable to low- and moderate-income families, revitalizing residential neighborhoods, maintaining existing housing stock, minimizing displacement and demolishing projects only as a last resort."

Although 12 U.S.C. § 1701z–11(a) speaks in terms of "policy," "purpose," and "goals," and undoubtedly gives the Secretary discretion, it nonetheless also sets limitations upon the exercise of that discretion and identifies factors which the Secretary must take into consideration in arriving at a particular decision. Subsection (a), in other words, is mandatory and not merely precatory, and provides a basis for judicial review.

Subsection (b), for instance, refers to the "requirements" of subsection (a):

The Secretary is authorized, in carrying out this section—

(1) to dispose of a multifamily housing project owned by the Secretary on a negotiated, competitive bid, or other basis, on such terms as the Secretary deems appropriate considering the low- and moderate-income character of the project, including the number of units in the project occupied by low- and moderate-income persons, *and the requirements of subsection (a) of this section,* to a purchaser determined by the Secretary to be capable of (A) satisfying the conditions of the disposition; (B) implementing a sound financial and physical management program; (C) responding to the needs of the tenants and working cooperatively with resident organizations; (D) providing adequate organizational staff and financial resources to the project; and (E) meeting such other requirements as the Secretary may determine. (Emphasis added).[3]

Stated most broadly, the Secretary's decision in a particular case must be exercised in a manner "consistent with" the "policy," "purpose," and "goals" set forth in the applicable statute. *See Kirby,* 675 F.2d 60, 68 (3d Cir.1982). Put in more precise terms, the "policy," etc., enumerated constitute the applicable "relevant factors" which must be considered by the Sec-

retary. *See Shannon v. HUD,* 436 F.2d 809, 819 (3d Cir.1970). As already has been stated, a reviewing court shall set aside agency action if it finds that such action was taken without consideration of these "relevant factors." *See also Russell v. Landrieu,* 621 F.2d 1037, 1041 (9th Cir. 1980).

However, although the Secretary is required to consider all the objectives set forth in the statute, there is, of course, no requirement that the specific course of action taken by the Secretary in fact further all of those objectives. If the Secretary makes a reasonable determination that furtherance of one (or more) objective is not feasible in a given instance, then the Secretary is under no duty to act only in a manner which will also further that objective. *See Russell,* 621 F.2d at 1041.

The above observations indicate the following with respect to the case presently before us. The Secretary must have considered the above "competing goals" in arriving at the decision to sell Everett Gardens without rehabilitation requirements and without Section 8 Certificates attached to the project. If, however, the administrative record reveals that the Secretary reasonably determined that furtherance of one (or more) of those "competing goals" was not feasible, then the Secretary was under no duty to act in a manner which would further that "goal" and this court may not set that decision aside.

Our review of the Secretary's decision in this case is not limited to 12 U.S.C. § 1701z–11(a). As was indicated previously, an agency itself is bound by its own validly promulgated regulations.

12 U.S.C. § 1701z–11(g) requires the Secretary to promulgate such regulations as may be necessary to implement the statute. It states that:

---

**3.** *See also Kirby v. United States Government, et al.,* 675 F.2d 60, 68 (3d Cir.1982): "Yet despite what appears to be an unbridled grant of discretion, this court has already recognized that HUD's broad discretion ... *must* be exercised in a manner consistent with the national housing objectives set forth in the several applicable statutes." (Emphasis added.) We can see no reason for treating the statute here in question, 12 U.S.C. § 1701z–11(a), any differently than we treated the several statutes in *Kirby.*

The Secretary shall issue such rules and regulations as may be necessary to carry out the provisions of this section. . . .

The regulations promulgated pursuant to this provision are at 24 C.F.R. § 290.01 et seq. (1983). Four of these regulations are of particular relevance here.

24 C.F.R. § 290.20 (1983) sets forth the objectives which are to govern the disposition of HUD-owned multi-family housing projects. The language used largely tracks the analysis just presented of 12 U.S.C. § 1701z–11(a). Subsection (f) is worthy of particular notice in this regard:

(f) These are national objectives and, while local circumstances may make it impossible to meet all the objectives, they should be met to the greatest extent feasible. In some cases the objectives may represent conflicting public policy goals and decisions will have to be madne to balance and choose among various objectives. In these cases discretion and judgment will have to be exercised in designing a program which best meets the national goals of providing affordable housing and preserving and revitalizing neighborhoods.

24 C.F.R. § 290.25(b) (1983) prohibits the sale of formerly unsubsidized projects serving as a lower-income housing resource without subsidies:

Formerly subsidized projects and formerly unsubsidized projects serving as a lower income housing resource, as determined pursuant to § 290.27(c), may not be sold without a subsidy if there is need for low and moderate income housing in the community.

24 C.F.R. § 290.27(c)(1) (1983) sets forth the criteria for determining the kind of subsidy to be provided to a project which has become a lower-income housing resource:

In a project which has become a lower income housing resource, evidenced either by the income levels of the present tenancy generally being at or below the eligibility criteria for subsidy, or its inability to attract higher income tenants to fill vacancies, subsidy pursuant to 24 CFR Part 886, Subpart B or C, shall be allocated to a sufficient number of units to prevent displacement of eligible tenants and to assure the financial feasibility of the project after sale.

Finally, 24 C.F.R. § 290.7 (1983) states that HUD can, under certain conditions, waive any of these provisions in a particular case. In particular, a waiver can be made upon a finding of "good cause:"

Upon completion of a determination and finding of good cause by the Assistant Secretary for Housing-Federal Housing Commissioner or his or her designee, HUD may waive any provision of this part in any particular case subject only to statutory limitations. Each waiver shall be in writing supported by documentation of the facts and reasons which formed the basis for the waiver.

Not only must the decision of the Secretary to sell Everett Gardens without rehabilitation requirements and without Section 8 Certificates be in accordance with 12 U.S.C. § 1701z–11(a), it also must comply with the above regulations set forth at 24 C.F.R. § 290.01 et seq. (1983).

## V.

 Our examination of the administrative record convinces us that the decision of the Secretary to sell Everett Gardens without rehabilitation requirements and without Section 8 Certificates because it would not be cost-effective to do so should not be set aside.

Numerous studies had been conducted by HUD prior to its acquisition of Everett Gardens.

A Property Disposition Appraisal was conducted. It found that the project was blighted and on the front lines of a declining urban area, and that 107 of the 184 units were vacant because they were uninhabitable. The appraisal also found that Everett Gardens was no longer capable of producing an income in excess of the value of the land. It recommended that the project either be demolished and the site

sold as vacant land or that it be completely rehabilitated. Given the condition of the project, the only feasible rehabilitation would be "complete gut rehab." The rent required to support the cost of such rehabilitation, however, would greatly exceed the rental cost of similar, nearby apartments. (A. 345–362).

A Project Statement also was prepared in which the repairs needed to bring the project up to housing codes were specified. The cost of "gut rehab" was estimated at $5.5 million, or $30,000 per unit. (A. 333–345).

A Property Disposition Review then was compiled by the Area Economist for HUD. Two disposition alternatives were considered: (1) demolition of abandoned/vandalized units and cash sale of the remainder without rehabilitation, but with Section 8 Certificates to qualified residents pursuant to 24 C.F.R. § 882 (1983); or (2) demolition of the entire project and relocation of existing tenants within the neighborhood. The latter alternative was recommended because it would have a more beneficial long-term effect on the neighborhood and would contribute to its stabilization. (A. 322–325).

Finally, a Pre-Acquisition Report was prepared. It stated that the project was detrimental to the neighborhood and that its seriously deteriorated condition precluded a higher occupancy rate without substantial rehabilitation. The report also stated that the project had no economic life "as is" or as repaired and that low market rents would not support the cost of rehabilitation. Sale of the project "as is," without further HUD involvement, was recommended. (A. 327–332).

A Disposition Recommendation then was prepared by HUD after it acquired title to the project. Once again, the report noted that substantial rehabilitation was needed but was not economically feasible because the estimated $5.5 million cost involved could not be covered by market rents. It was recommended that tenants be provided with Section 8 Certificates pursuant to 24 C.F.R. § 882 (1983) and that they be relocated. (A. 273–274).

A Disposition Authorization then was issued approving the sale of Everett Gardens without rehabilitation requirements and waiving the issuance of the Section 8 Certificates for the project. (A. 266–272).

The Disposition Authorization was accompanied by an Attachment. It stated that the health and safety of the tenants were threatened by conditions in the project and that the project had become uninhabitable. Rehabilitation was ruled out on account of the low market rents in the area and the high cost of rehabilitation. It stated that adequate vacancies to accommodate displaced tenants existed. Demolition of the project was not recommended but was to be left to the purchaser to decide. Displacement of tenants was necessitated by the hazardous condition of the project and the economic infeasibility of rehabilitation. The decision not to issue Section 8 Certificates for the project was based on the infeasibility of rehabilitation. (A. 275–291).

HUD subsequently sold Everett Gardens to a private developer without rehabilitation requirements and without the Section 8 Certificates for the project pursuant to 24 C.F.R. § 886 (1983).

There is a rational connection between the facts as HUD found them and the decision it ultimately reached concerning the disposition of Everett Gardens. Also, while it is not as clear cut as we would like it to be, the administrative record reveals that the Secretary's decision properly was based on a consideration of the relevant factors in 12 U.S.C. § 1701z–11(a). It indicates that the Secretary balanced the cost-effectiveness of disposing of Everett Gardens against the competing goals of furthering housing-related objectives and then reached a reasonable decision in accordance with the statute.

Plaintiffs' most substantial argument relies on 24 C.F.R. § 290.25(b), *supra*. The terms of that regulation require a subsidy in this case, since HUD concedes that there is an unmet need for housing in the area,

and Everett Gardens is a formerly unsubsidized low-income housing resource. (A. 409, 413). The district court correctly held, however, that HUD had made the reasonable determination of "good cause" necessary here to waive that regulation pursuant to 24 C.F.R. § 290.7, *supra.*

> The waiver authorization lists, *inter alia,* the following facts and reasons for waiver: the project is largely uninhabitable and would be expensive to repair ($5,500,000); the project is in a declining area; Section 8 subsidies are available for all displaced tenants who move; and there are adequate vacancies in the area to accommodate displaced tenants.... Essentially HUD's position is that it has limited financial resources; that it believes rehabilitation not to be the best way to use those resources; and that it has taken all possible steps to alleviate the hardship of the tenants who will have to be moved. This court finds nothing unreasonable about HUD's [good cause] determination.

(A. 412–13).

■■■ Still, plaintiffs contend that HUD's decision in this case cannot stand because the waiver regulation's "good cause" requirement is standardless and improperly authorizes HUD to engage in *ad hoc* decisionmaking. They note that "[n]o matter how rational or consistent with congressional intent a particular decision might be, [an administrative] determination ... cannot be made on an *ad hoc* basis by the dispenser of funds." *Morton v. Ruiz,* 415 U.S. 199, 232, 94 S.Ct. 1055, 1073, 39 L.Ed.2d 270 (1974) (Bureau of Indian Affairs could not apply a "real legislative rule" to deny benefits where the rule was not published in accordance with required procedures). We cannot agree with plaintiffs' underlying assumption, however, that all case-by-case administrative waivers of regulatory requirements are necessarily *ad hoc* and impermissible if made for "good cause." Where, as here, HUD's published regulations provide for such a waiver and the particular determination is consistent with the statutory mandate, *see supra,* a mere showing that the determination was

made on a case-by-case basis, without more, is insufficient to upset the administrative decision. *See National Wildlife Federation v. Marsh,* 721 F.2d 767, 773 (11th Cir.1983).

The judgment of the district court will be affirmed.

BECKER, Circuit Judge, dissenting.

In terms of national housing and fiscal policy, the result reached by the majority may indeed be preferable to the result sought by appellants. Resolution of the legal issue before us, however, depends not on our normative judgments but on the intent of Congress in enacting the HUD property disposition statute codified at 12 U.S.C. § 1701z–11 (1982). As I read that statute, it reflects a paramount congressional concern that housing units once owned by HUD remain available to persons of low and moderate incomes. The issue in this case, therefore, is whether, on the administrative record before us, HUD's decision to sell Everett Gardens without subsidies or repair requirements runs afoul of this mandate.

HUD has not seriously disputed that its action with respect to Everett Gardens furthers none of the housing and preservation goals enumerated in the property disposition statute. Rather, the agency has taken the position that the substantial rehabilitation of Everett Gardens would be "economically infeasible" and the Secretary prefers to spend elsewhere the money required to subsidize the rehabilitation. *But see infra* note 9 (noting that Congress appears to have rejected HUD-proposed legislation that would have given the Secretary broad discretion to allocate subsidies in a business-like manner).

The majority decides first that the Secretary of HUD has discretion under the statute to balance the "goal" of disposing of HUD-owned projects in a "cost-effective manner" against the "competing goals" explicitly enumerated in the law. The majority then examines the administrative record and concludes that it supports HUD's find-

ing of "good cause" to waive regulations that would have required the agency to process the sale of Everett Gardens with Section 8 subsidies. *See* 24 C.F.R. §§ 290.-25(b), 290.27(c)(1) (1983). Finding that determination to be consistent with HUD's statutory mandate, the majority upholds HUD's decision.

Sensible as this result may be as a matter of policy, I do not believe that it is consonant with the law. The majority's approach allows HUD discretion to sacrifice housing-related objectives, in pursuit of "cost-effectiveness," that I believe Congress did not intend to confer. As I read the statute and the regulations promulgated by HUD itself, "cost effectiveness" does not occupy a co-equal position with housing and preservation objectives. HUD must always act in furtherance of the latter; it may not disregard them in an individual case merely because it prefers to save money or spend appropriated funds in a different manner.

In disposing of HUD-owned properties, the agency's choices are limited to reasonable alternatives that will further the housing objectives. *See* 12 U.S.C. § 1701z–11(a). I believe that in some instances the

high cost of rehabilitation might render that alternative unreasonable under the statute and justify a decision to waive the regulations requiring sale with subsidies. *See* 24 C.F.R. § 290.7 (1983). But HUD has not presented the type of evidence required under its regulations to demonstrate that this is such a case and, in my view, HUD does not otherwise have discretion under the statute to "balance" cost-effectiveness against other goals. In short, the determination of whether subsidies are "too expensive" must be made with reference to the numerous regulatory standards that HUD has set for itself. *See infra,* Part II.

I find the majority's disposition of the case unsatisfactory because it upholds an administrative decision that is based upon factors not made relevant by HUD's own regulations or the governing statute. In particular the record reveals that HUD never considered the economic feasibility of rehabilitating Everett Gardens with Section 8 rent subsidies in light of the standards relating to cost set forth in HUD's own regulations.[1] Consequently, HUD failed to apply the proper standards for determining whether rehabilitation with Section 8 subsidies would be too costly. Instead, in mak-

---

1. Appellants in this case seek to compel the agency to process the sale of Everett Gardens with Section 8 subsidies. This procedure implicates the regulations set forth at 24 C.F.R. §§ 886.301–.335 (1983).

Under the Section 8 regulations, HUD and a purchaser, usually a private party, enter into a written contract pursuant to which HUD agrees to make housing assistance payments to the purchaser. 24 C.F.R. § 886.309. These payments are the "subsidies" referred to in this opinion. Subject to certain exceptions, *see id.,* these payments will be made only for housing units occupied by low-income "Eligible Families" as defined in HUD regulations. *See generally,* 24 C.F.R. §§ 889.101–.105 (1983).

In return for HUD's commitment to make assistance payments on behalf of low-income families, the purchaser agrees to comply with numerous HUD regulations. The purchaser of Everett Gardens, a project in need of substantial rehabilitation, would be required to rehabilitate the project in accordance with the minimum design standards established by HUD to ensure that the project would be placed in decent, safe, and sanitary condition. *See* 24 C.F.R. § 886.-302; HUD Handbook 4940.4. The developer

would also be required to comply with the comprehensive HUD regulations concerning, *inter alia,* marketing, 24 C.F.R. § 886.321; security and utility deposits, 24 C.F.R. § 886.315; and maintenance, operation and inspection, 24 C.F.R. § 886.323.

Under the regulations, the purchaser of the property is entitled to receive for each unit occupied by income eligible tenants an amount, denoted the Contract Rent, arrived at through negotiations with HUD. *See infra* part II (describing limitations on permissible contract rents). A portion of the contract rent is payable by the tenants as determined in accordance with HUD established schedule and criteria. 24 C.F.R. § 886.309; *see generally* 24 C.F.R. §§ 889.101–.105 (1983). The difference between the contract rent and the tenant contribution is the housing assistance payment provided by HUD. 24 C.F.R. § 886.309. The guaranteed HUD assistance payments are essential in persuading profit-motivated purchasers to undertake the rehabilitation and management of a project and in persuading lenders to extend credit to such developers, particularly when projects are located in declining areas that are unlikely candidates for private development.

ing its decision HUD relied primarily on the prevailing low market rents in the Camden area, a factor that is not relevant under the statute and regulations in the manner in which HUD employed it.

Because the administrative record in this case reflects either ignorance or disregard of HUD's own regulations, a decision based on this record cannot stand. Accordingly, I would remand the case to HUD for a proper determination, according to established regulatory standards, of the eligibility of Everett Gardens for Section 8 substantial rehabilitation subsidies.

### I.

The starting point of a review of the HUD decision in this case must be a careful examination of the property disposition statute itself. Congress established the property disposition program as part of the Housing and Community Development Amendments of 1978, Pub.L. No. 95–557, § 203, 92 Stat. 2080 (1978), at least partly in response to the earlier HUD policy of disposing of properties with a view only toward realizing maximum financial return and without consideration of the impact of such sales on the tenants in residence, the character and prospects for the neighborhood, or national housing goals. *See, e.g., Cole v. Lynn,* 389 F.Supp. 99 (D.D.C.1975), *aff'd sub. nom., Cole v. Harris,* 571 F.2d 590 (D.C.Cir.1977), *rev'd on other grounds,* 441 U.S. 39, 99 S.Ct. 1572, 60 L.Ed.2d 28 (1979); *Tenants for Justice v. Hills,* 413 F.Supp. 389 (E.D.Pa.1975). *See also HUD Property Disposition Handbook: Multifamily Properties* 3 (February 1971) ("It is the primary objective to dispose of all acquired multifamily properties at the earliest possible date at the highest price obtainable in the current market."), *reprinted in* Addendum to Appellant's Brief at 36, 37 (hereinafter "Addendum"). The 1978 Act reflected congressional disapproval of previous HUD policy and directed the agency to reorder its priorities.

For present purposes, the critical statutory language is set forth in subsection (a) of the HUD property disposition statute, 12 U.S.C. § 1701z–11 (1982); it establishes the framework within which HUD must operate in managing and disposing of HUD-owned property:

(a) It is the policy of the United States that the Secretary of Housing and Urban Development (hereinafter referred to as the "Secretary") shall manage and dispose of multifamily housing projects in a manner consistent with the National Housing Act and this section. The purpose of the property management and disposition program of the Department of Housing and Urban Development shall be to manage and dispose of projects in a manner which will protect the financial interests of the Federal Government and be less costly to the Federal Government than other reasonable alternatives by which the Secretary can further the goals of—

(1) Preserving the housing units so that at least those units which are occupied by low- and moderate-income persons or which are vacant, at the time of acquisition, are available to and affordable by such persons;

(2) Preserving and revitalizing residential neighborhoods;

(3) Maintaining the existing housing stock in a decent, safe, and sanitary condition;

(4) Minimizing the involuntary displacement of tenants;

(5) Minimizing the need to demolish projects; and

(6) Maintaining the project for the purpose of providing rental or cooperative housing.

The Secretary, in determining the manner by which a project shall be managed or disposed of, may balance competing goals in a manner which will further the achievement of the overall purpose of this section.

2 U.S.C. § 1701z–11(a), as amended.[2]

There can be little doubt that the sale of Everett Gardens with Section 8 subsidies, *see supra* note 1, would further the statu-

---

**2.** Amendments to the statute in 1980 broadened its coverage. Pub.L. No. 96–399, § 213, 94 Stat.

tory policies, *inter alia*, of preserving units as affordable housing for persons of low and moderate incomes; preserving and revitalizing the neighborhood surrounding Everett Gardens; minimizing involuntary displacement of tenants, and maintaining the project as rental housing.[3] In contrast, HUD's decision in this case furthers none of the six mandatory goals established by the disposition statute.[4]

The majority opinion recognizes, and I agree, that the language of 12 U.S.C. § 1701z–11(a) sets limitations upon the exercise of administrative discretion by the Secretary of HUD. *See* majority opinion, typescript at 8–9. But that language is not to be heeded or ignored at the whim of HUD. My disagreement with my colleagues centers on the nature and extent of those statutory limitations.

1636 (1980). In particular, the 1980 amendments add, *inter alia,* the goal of maintaining projects for the purpose of providing rental or cooperative housing, and provide that, unless it is "clearly inappropriate," the Secretary must seek to maintain full occupancy to the greatest extent possible in all multifamily housing projects owned by HUD. *But cf. Mandalay Shores Coop. Hous. Ass'n, Inc. v. Pierce,* 667 F.2d 1195 (5th Cir.1982) (1980 amendments to the Housing and Community Development Act do not alter parameters of Secretary's discretion in disposing of projects). The 1980 amendments also increase the number of projects subject to the law by adding, among others, projects such as Everett Gardens, which formerly were insured by HUD but had received no subsidies.

3. Moreover, the provision of Section 8 subsidies would comply with all of the HUD disposition objectives set forth in 24 C.F.R. § 290.20, as well as the requirements set forth at 24 C.F.R. §§ 290.25(b) and 290.27(c)(1), because Everett Gardens is a lower-income housing resource, *see* Appendix at 279 (Administrative Record at 34), majority opinion, typescript at 16, and the record unequivocally demonstrates a need for affordable housing in the community. Appendix at 273 (Administrative Record at 28); *id.* at 326–27 (Administrative Record at 81–82); *id.* at 345 (Administrative Record at 100). *See* part II *infra.*

4. HUD's decision does *not* preserve the occupied and vacant units for future affordable low-income housing because it provides no subsidies to ensure adequate rehabilitation. Instead, it results in the removal of affordable units from the market, notwithstanding the unmet need for

As construed by the majority, the statute contains seven potentially "competing goals." Six are set out explicitly at 12 U.S.C. § 1701z–11(a)(1)–(6), *supra.* The seventh is "the disposition of multifamily housing projects in a cost-effective manner." Majority opinion, at 1056. "Cost effectiveness," in the view of the majority, constitutes an independent goal, one which in this case justifies HUD's refusal to use available monies to further the housing-related goals set forth in the statute. The mandate for such administrative action, according to the majority opinion, is to be found in the language of § 1701z–11(a) that allows the Secretary to balance among competing goals in managing or disposing of an individual project. Majority opinion, at 1057.

low-income housing in the Camden area. The fact that HUD has found units for the tenants to be displaced is irrelevant to the congressional objective that the units at Everett Gardens be preserved as lower-income housing. HUD does nothing to relieve the shortage of housing which the statute seeks to address. The effects of the shortage are simply transferred to other persons who must remain on the waiting list for those units into which HUD seeks to move the tenants displaced from Everett Gardens. *See supra* note 3 (noting record evidence of the unmet need for low-income housing in the Camden area).

HUD's decision to sell Everett Gardens without repair requirements also fails to preserve and revitalize the surrounding neighborhood. In fact, HUD's sale of the project without repair requirements frustrates the current efforts to improve the neighborhood. Because there are no repair requirements attendant to the sale, HUD's decision will not encourage the maintenance of decent housing and virtually guarantees that the units will be maintained on the market in substandard condition, or be demolished. Third, HUD's decision does not minimize the involuntary displacement of tenants; indeed, most of the residents of Everett Gardens have already been relocated, and it seems likely that the relocation will be permanent in the absence of rehabilitation of the project. Fourth, by selling the project without subsidies sufficient to ensure proper rehabilitation, HUD's decision does not minimize the need to demolish the project, but consigns it to further deterioration. Finally, because of the absence of any rental use restrictions and subsidies, HUD's decision does not ensure the continued use of the project as rental housing.

I read the statute differently. First, its language evinces to me a paramount congressional purpose that HUD-owned properties be managed or disposed of so as to ensure that they remain available as decent and affordable housing for persons of low or moderate incomes.[5] Indeed, to some extent this overarching preservation objective finds expression in each of the six goals enumerated in the statute.[6] There may be, of course, situations in which the housing objectives may come into conflict, and in such cases I would concede the ability of the Secretary to balance among competing goals.[7] I do not read the administrative record in this case as establishing the existence of such a conflict, however.[8]

Second, while I recognize that the statute directs HUD to manage and dispose of properties "in a manner which will protect the financial interests of the Federal Government," 12 U.S.C. § 1701z–11(a), the statute *also* specifies that HUD's actions must be "less costly to the Federal Government than other reasonable alternatives *by which the Secretary can further*" the housing and preservation goals. *Id.* (emphasis added). The statutory language thus reflects a legislative determination that choosing the least costly alternative should be viewed as a means toward the end of improving housing conditions, not as a substantive goal to be pursued because of its intrinsic merit. Similarly, while the Secretary is vested with discretion to "balance competing goals relating to individual projects," this balancing must be undertaken in such a way that the ultimate decision will "further the achievement of the overall purpose" of the statute. *Id. See also* 24 C.F.R. § 290.20 (Disposition objectives) (where objectives conflict, HUD shall design a "program which best meets the national goals of providing affordable housing and preserving and revitalizing neighborhoods").

Thus, I conclude, unlike the majority, that the statute does not grant to HUD a

---

**5.** The legislative history echoes this paramount emphasis on preserving lower-income housing. The Senate Committee's Report states: "the principal goal of the [property disposition] program shall be to maintain the existing stock of multifamily projects as decent housing available to and affordable by low- and moderate-income families." S.Rep. No. 871, 95th Cong., 2d Sess., *reprinted in* 1978 *U.S.Code Cong. & Ad.News* 4796.

**6.** Thus, for example, using Section 8 subsidies to preserve housing units occupied by low- and moderate-income persons as decent, safe and sanitary housing affordable by these persons, will usually help to preserve or revitalize the surrounding neighborhood as well. This course of action will also, in the ordinary case, help to avoid the involuntary displacement of tenants and minimize the need to demolish projects, thereby removing them from the market.

**7.** One could conceive of a situation, for example, in which structural defects in a project render it irremediably unsafe. In such a case, the mandate to HUD to maintain safe housing exists in tension with the directive to avoid demolition and involuntary displacement of tenants where possible. Another example might be a housing project located in an area that has lost its residential character or is for some other reason inappropriate as a future situs for residential property.

**8.** HUD's property appraiser observed that the project had good basic design and construction, visual appeal, and was well planned with adequate open spaces. Appendix at 345 (Administrative Record at 99). The neighborhood, although struggling, did not threaten the well being of the tenants. *Id.* at 277 (Administrative Record at 32). In fact, there have been recent improvements in the neighborhood, including a new library, a new health center, and a new recreation field adjacent to the project, as well as a new wing to a nearby hospital. *Id.* at 345 (Administrative Record at 99).

The surrounding neighborhood is primarily residential, with mostly pre-war, two-story brick residences. *Id.* at 324 (Administrative Record at 79). Many of those houses show pride in ownership. *Id.* at 345 (Administrative Record at 99). Everett Gardens is the only blighted housing in the neighborhood. *Id.* at 346 (Administrative Record at 100). There is public transportation one block away, *id.* at 333 (Administrative Record at 88), and the main commercial area serving the project is just a few blocks east. *Id.* at 324 (Administrative Record at 79). There is a chronic shortage of family rental housing in Camden, *id.* at 326–27 (Administrative Record at 81–82), and correspondingly a strong demand for family units in the area. *Id.* at 327, 346 (Administrative Record at 82, 100). Another project in the neighborhood, built around the same time as Everett Gardens, but well maintained, has full occupancy and a waiting list.

broad-ranging mandate to reject housing and preservation considerations identified as important by Congress when the alternative is a savings in money but not advancement of the identified housing goals.[9] The district court erred, in my view, in concluding essentially that the statutory provisions, all of which militate against the Secretary's position, *see supra* note 4, had no impact on the proper disposition of the case.

## II.

An examination of statutory provisions alone does not end our review of HUD's decision, as the majority opinion acknowledges. *See* majority opinion, at 1057–1058. The pertinent HUD regulations, *see* 24 C.F.R. §§ 290.1–.55 (1983) (Management and Disposition of HUD-Owned Multifamily Housing Projects); 24 C.F.R. §§ 886.-301–.335 (1983) (Section 8 Housing Assistance Program for the Disposition of HUD-Owned Projects), also restrict the agency's discretion. *See* majority opinion, at 1058; *see also United States v. Kirby*, 675 F.2d 60, 68 (3d Cir.1982) (court may review HUD action to determine compliance with HUD regulations). HUD has promulgated these regulations in accordance with authority granted by Congress, *see* 12 U.S.C. § 1701z–11(g) (directing HUD to publish regulations implementing the goals of the property disposition program for HUD-owned multifamily projects), presumably for the purpose of enabling HUD to deter-

mine when a particular course of action is a "reasonable alternative" within the meaning of 12 U.S.C. § 1701z–11.

My analysis of the regulations leads me to conclude that HUD's actions on this administrative record are not "consistent with [HUD's] statutory mandate," majority opinion, at 1060, or with HUD's own regulations. The agency has not shown why the substantial rehabilitation of Everett Gardens with Section 8 subsidies is not a reasonable alternative by which the Secretary can further the housing and preservation goals set forth in 12 U.S.C. § 1701z–11. In addition, HUD has failed in my view to establish the requisite "good cause" to waive a regulation that requires the agency to process the sale of Everett Gardens with sufficient subsidies to make the rehabilitation financially feasible. Unlike the majority, I conclude that the agency has not articulated a satisfactory explanation for its action. *See Motor Vehicle Manufacturers Association Ass'n v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29, 103 S.Ct. 2856, 2866–67, 77 L.Ed.2d 443 (1983). I turn now to an examination of the administrative record and regulations.

### A.

The most important regulations in this case are set forth at 24 C.F.R. §§ 290.-25(b), 290.27(c)(1). *See* majority opinion, at 1058 (setting forth text of regula-

---

9. The passages from the legislative history of the property disposition statute cited by the majority also support this position, for the legislative history, no less than the language of the statute itself, emphasizes the primacy of housing concerns and the essentially subsidiary nature of "cost-effectiveness." *See* majority opinion, at 1056 n. 2.

HUD, too, appears to recognize the extent of the limits on its discretion under the present statutory scheme. HUD has proposed that Congress amend the disposition statute "to remove most of the restrictions on the management and disposition of HUD-owned property." *See* HUD's section-by-section analysis of its proposed 1982 housing legislation, reported at Housing and Urban-Rural Recovery Act 1982: Hearings Before the House Subcommittee on Housing and Community Development, 97th Cong., 2d Sess.

2754 (statement of HUD Secretary Pierce). According to HUD, its proposal was "designed to remove the current restrictions on the management and disposition of HUD-owned properties so that the Secretary can handle these properties on a businesslike basis." HUD's present law "mandates a bias toward the continued use of the property for low and moderate income housing, without a realistic regard for the economic consequences to the government of such continued use." *Id.* at 2756. Congress' refusal to adopt HUD's "businesslike" proposal, which was not incorporated into the legislation reported out of either the House or Senate committees in 1982, thus reflects the consistent commitment to the existing congressional policy emphasizing the mandatory non-financial preservation objectives of the disposition program.

tions). The parties and the majority appear to agree that, unless properly waived, the regulations require HUD to process the sale of Everett Gardens with Section 8 subsidies. The Secretary relies, however, on a waiver provision permitting HUD, upon a "finding of good cause," to waive these regulations, "subject only to statutory limitations." 24 C.F.R. § 290.7 (Waivers). Despite deficiencies in an administrative record which even the majority notes— charitably, in my view—"is not as clear as [it] would like it to be," majority opinion, at 1059, both the district court and the majority have accepted HUD's waiver argument, noting HUD's three purported justifications: first, that the project is uninhabitable in its present condition; second, that adequate vacancies exist to accommodate the displacement of tenants; and third, that low market rents and high cost preclude rehabilitation. Majority opinion at 1059, 1060; Appendix at 412–13 (letter opinion of the district court).

As an initial matter, I believe that the first and second justifications are clearly inadequate to support HUD's decision. In its application for a waiver of the regulations requiring sale with subsidies, HUD does not discuss why the present condition of a project should rule out its rehabilitation with assistance under Section 8. Appendix at 256 (Administrative Record at 11). Indeed, the very existence of a substantial rehabilitation program, see, e.g. HUD Handbook 4940.4 (minimum design standards for substantial rehabilitation projects), suggests that the present condition of a project, blighted though it may be, cannot be conclusive on the issue of the feasibility of rehabilitation, and hence cannot constitute "good cause" to forego the rehabilitation. HUD's appraiser concluded only that the project *in its present condition* threatened the safety and well-being of the tenants, and never that rehabilitation was technically infeasible. Appendix at 345–50 (Administrative Record at 99–104). *Cf. supra* note 1 (waiver may be appropriate if structure is beyond repair). In addition, for the reasons noted above, *see supra* note 4, HUD's success in placing Everett Gardens tenants in other projects merely perpetuates the existing shortage of low-income housing in Camden, as it removes a lower-income housing resource from the community. Therefore, this justification for the waiver must also fail.

### B.

HUD's primary ground for rejecting the rehabilitation of Everett Gardens with Section 8 subsidies is that the estimated ($5.5 million) cost of the rehabilitation is simply too high. Unfortunately, the district court and majority opinions, like the administrative record, suggest no method for determining whether this is a legitimate ground for a waiver. If Congress had given HUD the discretion to operate its property disposition program on a "business-like" basis, perhaps HUD's simple assertions that rehabilitation would be too costly would suffice to sustain its action. *But see supra* note 9 (indicating that Congress has, in fact, rejected such a course). Because the statute and HUD regulations do not allow the agency such latitude, however, HUD's action here must be examined in light of those provisions and their underlying policies, *see supra* part I. *See Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971) (agency action must be based on factors Congress has intended it to consider).

Taken together, the property disposition statute and relevant HUD regulations constitute a coherent framework for evaluating HUD's decision. The disposition statute and the HUD disposition objectives require the agency to work to the greatest extent possible toward the achievement of congressionally mandated housing goals. 12 U.S.C. § 1701z–11; 24 C.F.R. § 290.20. *See* part I *supra*. The subsidy rule incorporated in 24 C.F.R. §§ 290.25(b), 290.-27(c)(1) furthers the legislative mandate by establishing a presumption that lower-income housing resources should be sold with subsidies.

I do not suggest, however, that the regulations set forth an inflexible requirement that HUD-owned low-income housing resources be sold only with Section 8 subsidies. In general it would appear that the presumption to this effect can be overcome where any one of three conditions exists. First, HUD may have resources sufficient to fund only a portion of those rehabilitation projects that meet all reasonable tests in terms of the project's cost and its contribution toward the advancement of national housing policy. In such a situation, it falls to the agency to determine which projects, if subsidized, can best fulfill public policy. Moreover, I assume that the statute permits HUD, in making this choice, to consider the cost of a project in this category along with the extent to which it will advance national housing goals. This scenario is not relevant to the present case, however, because HUD has not argued that limited funds prevent it from subsidizing the rehabilitation of Everett Gardens.

Second, HUD may be able to demonstrate that rehabilitation of a particular project is not reasonable, *see* 12 U.S.C. § 1701z–11(a), because, irrespective of cost, it actually would not further national housing goals, despite the presumptive judgment to the contrary embedded in 24 C.F.R. §§ 290.25(b), 290.27(c)(1). As I point out *supra*, at 1064 & n. 7, however, the record in this case does not establish this proposition, nor does HUD seriously assert it.

Third, and most relevant to this case, the statute gives HUD some discretion to demonstrate that rehabilitating a particular project is not reasonable for financial reasons. *See* 12 U.S.C. § 1701z–11(a). Specifically, the agency could argue that, although the rehabilitation would have a salutary effect in terms of the statutory

housing goals, the rents that would have to be fixed in order to support the rehabilitation do not satisfy one or more tests of financial soundness, or "cost-effectiveness," established by regulation. *See* part IID *infra.*[10]

Only when one of these conditions exists with respect to a particular project will there be a prima facie showing that a waiver of the usual rule of sale with subsidies is appropriate for financial reasons. That is, HUD must demonstrate the existence of one of the conditions to support without more, the invocation of the "good cause" waiver provision, *see* 24 C.F.R. § 290.7. HUD's use of the waiver otherwise constitutes a violation of its own regulations sufficient to set aside its decision. *See Kelly v. Railroad Retirement Board,* 625 F.2d 486, 492 (3d Cir.1980); majority opinion, at 1055–1056. Moreover, an improper use of the waiver provision would also be in violation of HUD's statutory mandate to use reasonable measures to further the housing and preservation objectives established by Congress. *See* 12 U.S.C. § 1701z–11. *Cf. Kirby v. United States,* 675 F.2d 60, 68 (3d Cir.1982) (court will review HUD decision to assure itself that the decision does not needlessly conflict with national housing objectives); *Russell v. Landrieu,* 621 F.2d 1037, 1041 (9th Cir.1980) (if HUD Secretary acted in a manner that failed to consider and implement alternatives that would further national housing policies, his action would constitute an abuse of discretion).

Even if the Secretary's decision to sell the project "as is" might on a fully developed record be within the scope of his statutory authority, a reviewing court must nevertheless examine the decision closely to determine whether the decision has resulted from a process that has considered

**10.** Of course, in the appropriate case HUD could also make the obverse argument, *i.e.,* that even though the rehabilitation of a low-income housing resource would *not* fall within the rent-level guidelines in the regulations, the project should nonetheless be undertaken because it would have an especially positive impact on the achievement of the housing and preservation

goals established by Congress. HUD's ability to employ the waiver provision in such a case would seem to be limited only by independent statutory constraints, such as the Fair Market Rent limitation. *See* 42 U.S.C. § 1437f(c)(1). *See also* part IID *infra* (discussing fair market rent limitation).

relevant factors and alternatives. *See Motor Vehicles Manufacturers Association,* 103 S.Ct. at 2866–67; *Overton Park,* 401 U.S. at 416, 91 S.Ct. at 823. Although the scope of review of agency decisions under the "arbitrary and capricious" standard is a narrow one, *Motor Vehicles Manufacturers Association,* 103 S.Ct. at 2866, the court must "satisfy itself that the agency has exercised a reasoned discretion, with reasons that do not deviate from or ignore the ascertainable legislative intent." *Greater Boston Television Corp. v. FCC,* 444 F.2d 841 (D.C.Cir.1970). *See United States v. Kirby,* 675 F.2d 60, 68 (3d Cir. 1982). This aspect of the judicial function requires that the agency base its decisions on a record that allows for meaningful review. *See, e.g., Bethlehem Steel Corp. v. EPA,* 651 F.2d 861 (3d Cir.1981). As a careful examination of the administrative record and applicable regulations in this case reveals, HUD's actions fall short of these standards.

### C.

In order to evaluate HUD's Everett Gardens decision properly, we must first have a clear understanding of what HUD decided. The HUD property appraiser first estimated the total cost of rehabilitation ($5.5 million). He then calculated the rents that a private landlord would have to charge in order to meet operating expenses, service the debt required to finance the acquisition and rehabilitation of the project, and still retain a reasonable profit. This rent, denoted the Contract Rent in the HUD regulations, *see, e.g.,* 24 C.F.R. § 886.302, was estimated to be $526 a month, plus utilities. Appendix at 349, (Administrative Record at 103); Brief of Appellee at 6.[11]

Next, the appraiser analyzed the existing housing market in the area near Everett Gardens and estimated that $150 a month

represented a reasonable rent for the units at Everett Gardens in their blighted condition. Appendix at 349 (Administrative Record at 103). Based upon his "market analysis," the appraiser concluded that the private rental market in the Everett Gardens neighborhood would not support the estimated post-rehabilitation contract rent. This conclusion became the controlling consideration in HUD's decision-making process. This conclusion figures prominently in both the HUD Pre-Acquisition Report, Appendix at 327–332, and its Disposition Recommendation, Appendix at 273–274. *See* majority opinion, at 1059.

HUD regulations contain at least three relevant standards against which this reasoning and conclusion must be assessed: the rent reasonableness determination, 24 C.F.R. § 886.310(a); the fair market rent limitation, 24 C.F.R. § 883.310(b); *see also* 42 U.S.C. § 1437f(c)(1); and the percentage of replacement cost test, 24 C.F.R. § 290.-43. The record indicates that at best HUD considered only the first of these tests, but that it did so improperly. The record is barren of any evidence that HUD considered the other two tests. I consider each of these in turn.

### D.

The only regulatory test even arguably undertaken by HUD in this case is the so-called "rent reasonableness" determination. *See* 24 C.F.R. § 886.310(a). The regulation provides that proposed Contract Rents for section 8 housing (estimated to be $526 a month plus utilities for Everett Gardens, after substantial rehabilitation, *see supra* ) shall not exceed rents for private market units that are *comparable* in terms of location, quality, amenities, facilities, management and maintenance services to be provided, and the like. *Id.* HUD's

---

11. The amount of subsidies that a Section 8 project will ultimately require depends on the price for which HUD can sell the project initially, the contract rent, and the income levels of the tenants who later occupy the units. See

note 1, *supra.* As the discussion below indicates, the regulations speak in terms of contract rents and unit rehabilitation costs rather than subsidy levels, since the actual subsidy level will depend upon tenant incomes levels.

cursory comparability determination does not address the standard established in the regulation. While the regulation requires HUD to compare the proposed post-rehabilitation rents to the rents of comparable units, *i.e.,* substantially rehabilitated units, the HUD appraiser chose as the most comparable project a 30 year-old project that had never been rehabilitated, where rents are $195 a month. Appendix at 356 (Administrative Record at 110).

It does appear that the estimated post-rehabilitation rents for Everett Gardens would exceed the rents for existing units in the Camden area. This conclusion is where HUD ended its analysis, but is beside the point. It seems obvious that the rents for existing units will generally be lower than those for newly renovated units in the same neighborhood. Presumably for this reason, HUD regulations require that the rent reasonableness test for a substantial rehabilitation project be carried out by using the rents at other rehabilitated projects for comparison. HUD never obtained data for other substantially rehabilitated private dwellings (or, if these do not exist in the general vicinity of Everett Gardens, HUD-insured or HUD-assisted projects, *see* 24 C.F.R. § 886.310(a)), however, or conducted the analysis required under the regulation.

In addition, the HUD handbook for substantial rehabilitation processing provides for a variation of the standard comparison for projects where the neighborhood's physical and economic conditions have depressed the neighborhood's market rents below the level needed to support new or substantially rehabilitated units. *See* HUD, *Section 8 Housing Assistance Payments Program—Substantial Rehabilitation Processing,* Handbook 7420.2, Rev.-1, Ch. 9, ¶ 9–7, pp. 9–41 to 9–42 (*reprinted in* Addendum at 40). In such cases, HUD appraisers are supposed to look to neighborhoods with recently rehabilitated housing and use such projects as comparables, *"without adjustment for differences between the physical and economic condi-*

*tions of the subject and comparable neighborhoods* except for those differences attributable to tax and/or utility rates." *Id.* (emphasis in original). The record does not disclose that HUD ever considered whether this variation might be appropriate in the present case. The Secretary's assertions in his brief that HUD did conduct the requisite rent reasonableness test are belied by the record and constitute *post hoc* rationalizations that cannot compensate for HUD's failure to develop a reasoned basis for its decision on the record. *See Motor Vehicle Manufacturers Association,* 103 S.Ct. at 2867; *SEC v. Chenery,* 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947).

Further evidence of HUD's casual approach to its own regulations is the agency's failure even to consider other regulatory standards that have been promulgated for the purpose of limiting Section 8 subsidies. The first of these standards is the fair market rent limitation (FMR). 24 C.F.R. § 886.310(b). This test is derived directly from legislation designed to check excessive subsidies. *See* 42 U.S.C. 1437f(c)(1). For the Section 8 property disposition program, HUD sets the FMRs at the rent levels necessary "to obtain privately developed and owned, newly constructed rental housing of modest (non-luxury) nature with suitable amenities and sound architectural design" 24 C.F.R. § 886.302 (1983) (fair market rents for projects sold by HUD which are in need of substantial rehabilitation). The obvious policy furthered by these limits is that rents under the Section 8 program should not subsidize luxury or provide excess profits to private developers, but provide for moderately designed housing for tenants with low or moderate incomes.

In fiscal year 1983, the FMRs in the Camden area for two bedroom, semi-detached row units like Everett Gardens, which have been substantially rehabilitated, were $675 per month. 48 Fed.Reg. 16,424, 16,428 (April 15, 1983). By statute,

HUD cannot approve a project if the rents necessary to support rehabilitation exceed 110 percent of that FMR (here $742 a month), unless exceptional circumstances justify a figure of up to 120 percent of the FMR (here, $809 a month). 42 U.S.C. § 1437f(c)(1). By regulation, HUD has provided that rents for Section 8 property disposition projects must come within the FMR limit, unless local HUD officials determine that special circumstances warrant higher rents not to exceed the statutory limit of 20 percent over FMR. 24 C.F.R. § 886.310(b).

As noted above, HUD officials concluded that rents of $526 a month, plus $90 for utilities, would support the substantial rehabilitation of Everett Gardens. Appendix at 349–50 (Administrative Record at 103–04); Brief of Appellee at 6. That figure is well under the $675 a month FMR for a two-bedroom substantially rehabilitated project in the Camden area. Yet nowhere in the administrative record is there any indication that the HUD officials ever considered the FMRs for substantially rehabilitated housing.[12] The failure of HUD officials even to consider the prescribed FMR test, much less follow it, further undermines the rationality of their decision not to subsidize substantial rehabilitation of Everett Gardens.

12. In fact, the only accurate reference to FMRs in the record is to the $352 a month FMRs for existing housing. Appendix at 329 (Administrative Record at 83). Those rents, however, are for existing units which have not been rehabilitated. HUD regulations require that agency officials select the particular FMR limitations in accordance with the amount of work to be done on the project. 24 C.F.R. § 886.302 (1983) (fair market rent). Here where gut rehabilitation was necessary, the substantial rehabilitation rents are the relevant ones. *Id.*

13. In January 1980 HUD established an additional cost containment test for the Section 8 substantial rehabilitation program, *i.e.,* a limit on the total cost per unit of projects that could be subsidized. 24 C.F.R. § 881.204(c) (1983). HUD has set the limit for two bedroom units at $32,983, while reserving the power to increase that figure periodically to reflect cost increases. 24 C.F.R. § 881.204(c)(1)(i) and (c)(5) (1983).

Another regulatory test for determining when rehabilitation costs are excessive involves a comparison of the cost of rehabilitation and the cost of replacing the units by new construction. Under 24 C.F.R. § 290.-43(a)(2) (1983), HUD may demolish a project as a last resort, if the cost of repairing a project exceeds 85 percent of the replacement cost of the project. But HUD officials never compared the cost of repairs and the cost of new construction. The 85 percent test is relevant to this case because the fundamental premise of HUD's decision-making process was that the project had no remaining economic life and, thus, should be demolished, although that decision was being left up to the purchaser. Appendix at 346 (Administrative Record at 100). My point is simply that, as with the FMR limitations, HUD ignored a relevant factor in determining when rehabilitation costs are excessive.[13]

In sum, HUD either failed to consider or misapplied each of the relevant regulatory standards discussed above. The agency concluded that the proposed post-rehabilitation rent for Everett Gardens was greater than the prevailing market rent for existing units in the neighborhood and terminated its analysis at that point. This process falls short of providing the "reasoned basis" necessary if we are to sustain adminis-

This limitation would appear to be reflect a judgment that housing of modest but suitable quality for low-income families should be available for $32,983 a unit. But the "excessive" rehabilitation costs of Everett Gardens were $30,000 per unit, below the basic $32,983 limit considered acceptable by HUD. Although HUD has not made this test directly applicable to the substantial rehabilitation of a project under the property disposition program, the regulatory limit would seem to provide a norm for judging whether rehabilitation costs are excessive. Yet no HUD official even considered whether Everett Gardens would come within this limit. I fail to see how HUD can find rehabilitation costs of $30,000 a unit excessive if it has established, by regulation, that costs at $32,983 or below are acceptable. At a minimum, it cannot do so without addressing the issue in the administrative decision-making process and explaining in the record why the project cost would be excessive despite the regulation.

trative action. *SEC v. Chenery*, 332 U.S. at 196, 67 S.Ct. at 1577.

### III.

I conclude where I began—with the observation that it may well be far wiser for Congress to permit HUD to assure an adequate supply of decent and affordable low-income housing by operating its property disposition program in a businesslike manner, and to give the Secretary broader or even unbridled discretion to waive the rehabilitation and subsidy requirements and refuse to spend appropriated funds because he prefers other alternatives. But until Congress gives the Secretary this authority, he cannot so act. Because HUD's decision-making process on this record, for the reasons I have explained at length, fails to consider established standards for determining when Section 8 subsidies should be waived, the decision should not stand. After the necessary analysis of the situation, however, HUD might properly conclude that the required contract rent for a rehabilitated Everett Gardens fails the rent reasonableness test, for example, I would vacate the judgment of the district court and remand the case to HUD for further development of the record.

I respectfully dissent.