Antonio POU PACHECO, d/b/a Torrefaccion Mi Tacita, Pou De Pou, Ilba Maida, and Their Conjugal Partnership, Plaintiffs, Appellees,

v.

Carlos SOLER AQUINO, etc., et al., Defendants, Appellants.

No. 86–1991.

United States Court of Appeals, First Circuit.

Heard June 5, 1987.

Decided Nov. 18, 1987.

Esteban J. Nunez–Hoyo, P.R. Justice Dept., with whom Rafael Ortiz Carrion, Sol. Gen., and Norma Cotti Cruz, Deputy Sol. Gen., Rio Piedras, P.R., were on brief, for defendants, appellants.

John M. Garcia with whom Elisa Bobonis Lang and John M. Garcia Law Offices, Hato Rey, P.R., were on brief, for plaintiffs, appellees.

Before COFFIN, DAVIS* and TORRUELLA, Circuit Judges.

DAVIS, Circuit Judge.

This case comes to us on appeal from the United States District Court for the District of Puerto Rico. Following a jury trial, Judge Acosta ordered appellants to compensate appellees under the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970 (URA or Relocation Act), 42 U.S.C. § 4601 *et seq.*, as follows:

| | |
|---|---:|
| for dismantling | $ 10,000 |
| for moving expenses | $ 9,000 |
| for rental expenses (storage) | $ 70,000 |
| for search costs | $ 55,000 |
| for reinstallation of machinery and equipment | $102,600 |
| for value of new equipment and machinery | $393,300 |

plus costs. *Pacheco v. Aquino*, Civil No. 80–1736 (RLA) (D.P.R. July 31, 1986) (judgment). We affirm.

## I. *Background*

On February 8, 1978, the Commonwealth of Puerto Rico (Commonwealth) filed a petition in Superior Court to acquire, through condemnation, real property belonging to Mr. and Mrs. Antonio Pou Pacheco (appel-

* Of the Federal Circuit, sitting by designation.

lees or Pou).[1]  Judgment was entered in favor of the Commonwealth on October 17, 1980.  The condemned properties consisted of a tract of land measuring five "cuerdas" and three buildings: a house, a cabinet-maker's shop, and a facility for grinding, processing, warehousing and selling coffee.[2]

The Commonwealth tendered to Pou $106,531.02 as "just compensation" for the expropriated properties.  Dissatisfied, appellees brought suit and persuaded the district court that, as "displaced persons" within the meaning of the URA, they were entitled to compensation for a variety of additional expenses incurred after and flowing from the condemnation proceedings.[3]  The delicate nature of coffee torrefaction equipment significantly muddies the issues percolating on this appeal.  Testimony at trial established that, unless maintained through regular use, torrefaction machinery quickly slips into disrepair and eventually becomes worthless.  The upshot of this is that Pou's first attempt in January 1979 to relocate his business proved to be temporary.  For 18 months, Pou stored his equipment in a state of maintenance at the Playa de Ponce, Number 52 Mirasol.  However, Torrefaccion Mi Tacita was never fully operational at that location.  The Commonwealth's refusal to pay storage costs beyond the 12 month period forced Pou to move his equipment a second time.  Accordingly, in June 1980, Pou again relocated his business, this time to Calle del Sol, Road 139, Kilometer 1.0.[4]

Appellant challenges as contrary to law the district court's order awarding reimbursement to appellees for six distinct categories of expenses: dismantling expenses; moving expenses; storage rental expenses; search costs; reinstallation of machinery and equipment; and value of new equipment and machinery.  Before separately reviewing the awards under each category, we examine the policies underlying the applicable federal law as disclosed through the statute and relevant legislative history.

## II.  *The Relocation Act of 1970*

In 1970, Congress passed the Relocation Act, concluding nearly a decade of effort directed towards standardizing federal legislation regarding relocation assistance. *Alexander v. United States Dep't of Housing and Urban Dev.*, 441 U.S. 39, 49, 99 S.Ct. 1572, 1580, 60 L.Ed.2d 28 (1979).  Prior to the 1960's, persons displaced when federal agencies acquired property for designated public projects received whatever assistance Congress, on an ad hoc basis, deemed appropriate.  *Id.*[5]

1.  Under title 32, § 2907 of the Laws of Puerto Rico, Annotated (L.P.R.A.), title to the condemned properties passes to the Commonwealth when the Commonwealth files condemnation papers and deposits the estimated amount of just compensation with the court.  The Commonwealth originally deposited $56,660.  It later reached an agreement with Pou and deposited an additional $49,871.02.  Although the record is unclear, the condemnation appears to have facilitated the construction of a state highway and a flood protection project involving channel improvements on the Portugues and Bucana rivers.  Because the project was authorized by the Flood Control Act, Public Law 91–611, 91st Cong. 2d Sess., and consumed federal funds, the provisions of the URA are applicable.

2.  This last structure, known as "Torrefaccion Mi Tacita," is at the center of the current controversy.  Loosely translated, "Torrefaccion Mi Tacita" means "my small coffee cup torrefaction."

3.  Named defendants included Carlos Soler Aquino, Area and Property Acquisitions Director of the Puerto Rico Highway Authority; Luis Enrique Landrau, Executive Director of the Puerto Rico Highway Authority; Rafael Faria, Secretary of the Transportation and Public Works Department of Puerto Rico; the Puerto Rico Highway Authority; the Department of Transportation and Public Works of Puerto Rico; and the Commonwealth of Puerto Rico.  For purposes of this appeal, we shall refer to these parties collectively as "appellant" or "the Commonwealth."

4.  Although Calle del Sol was intended to be the permanent location for Torrefaccion Mi Tacita, Pou's inability to obtain the necessary permits prevented the business from ever becoming fully operational at this site.

5.  *See, e.g.,* Tennessee Valley Authority Act of 1933, ch. 32, 48 Stat. 58, as amended, 49 Stat. 1080; Act to Authorize Certain Construction of Military and Naval Installations, Pub.L. 82–155, § 501(b), 65 Stat. 364 (1951).

Responding to substantial variations in relocation benefits, the House Public Works Committee created the Select Subcommittee on Real Property Acquisition in 1961. Three years later, the Subcommittee proposed the "Fair Compensation Act" (FCA) to address the severe deficiencies in existing law. Although never enacted, the FCA, as progenitor of the URA, formed the basis for most of the provisions ultimately codified in the Relocation Act. *Alexander*, 441 U.S. at 49, 99 S.Ct. at 1580. Thus, the FCA's declared purpose—to afford "persons affected by the acquisition of real property in Federal and federally assisted programs ... *fair and equitable treatment* on a basis as nearly uniform as is practicable"—is instructive. Select Subcommittee Study 147 (emphasis added). *Id.* at 50, 99 S.Ct. at 1590. That Congress refused to abandon this broad objective is palpable in the express terms of § 201 of the URA. That section provides:

### Declaration of policy

The purpose of this subchapter is to establish a uniform policy for the fair and equitable treatment of persons displaced as a result of Federal and federally assisted programs in order that such persons shall not suffer disproportionate injuries as a result of programs designed for the benefit of the public as a whole.

A House Public Works Committee report which accompanied the URA fleshed out the purpose of the law:

The need for [the URA] arises from the increasing impact of Federal and federally assisted programs as such programs have evolved to meet the needs of a growing and increasingly urban population. * * * Also, a major public project—be it a highway, urban renewal project, or hospital—inevitably involves the acquisition and clearance of sites which now provide residential, commercial, or other services. *As the thrust of Federal and federally assisted programs have [sic] shifted from rural to urban situations, it became increasingly apparent that the application of traditional concepts of valuation and eminent domain resulted in inequitable treatment for large numbers of people displaced by public action.* When applied to densely populated urban areas, with already limited housing, the result can be catastrophic for those whose homes or businesses must give way to public needs. The result far too often has been that a few citizens have been called upon to bear the burden of meeting public needs.

H.R.Rep. No. 91–1656, 2d Sess., *reprinted in* 1970 U.S.Code Cong. & Admin.News 5850, 5851 (emphasis added).

Our review of the challenged awards under the URA must take place against this background of strong congressional support for the fair and equitable treatment of displaced persons and businesses, as well as Congress' expressed willingness to depart from traditional notions of valuation and eminent domain.

### III. *The Challenged Awards* [6]

### (a) Dismantling of Equipment

■ At trial, appellee claimed dismantling expenses totalling $10,000. According to uncontroverted testimony, Pou was forced to dismantle the equipment twice, each time at a cost of $5,000. Nonetheless, appellant argues that the court erred in allowing compensation for two dismantlings because the applicable regulations provide for reimbursement for only one dismantling. The relevant regulation reads in pertinent part:

---

**6.** In order to appreciate fully the expense involved in the relocation of Torrefaccion Mi Tacita, an itemization of the coffee roasting business inventory is helpful: 500 gallon water tank; chimney stack measuring 128 feet long and 15 inches in diameter; 2 screw conveyors; steel blower with an encased motor measuring five feet; BEAZ Burner; bucket elevators; funnels; reservoir; grinder; electronic panel; two Beamis scales; timer; compressor motor; gas regulator; gas valve; water pipe; scale and bag opening machine; vibrator; sealer; coffee bag cutting, gluing and closing machine; table; three large weighing scales; drums; 150 boxes of bags; refrigerator; 50 sacks of coffee; miscellaneous tools, office equipment, and replacement equipment.

§ 641.62 Actual reasonable expenses in moving.

(a) *Allowable moving expenses.*

(6) Removal, reinstallation, reestablishment, including such modification as deemed necessary by the District Engineer, and reconnection of utilities for machinery, equipment, appliances, and other items, not acquired as real property. Prior to payment of any expenses for removal and reinstallation of such property, the displaced person shall be required to agree in writing that the property is personalty and that the Government is released from any payment for the property.

32 C.F.R. § 641.62 (1973 as amended 1979)[7].

In the circumstances of this case, it is entirely reasonable that appellant should bear the cost of two dismantlings. First, although the quoted regulation does not specifically provide for reimbursement for more than one dismantling, neither does it explicitly prohibit such compensation. Appellant's bald assertion that the text of the regulation contemplates only one dismantling is unpersuasive.

Second, in this case full reimbursement for both dismantlings is required to effectuate the stated purpose of the Relocation Act—providing fair and equitable treatment for those displaced by federal programs. Pou's unchallenged testimony was that he was forced to abandon the Playa de Ponce location because he was unable to afford the rent. Presumably, Pou's financial hardships were related, at least in part, to the Commonwealth's condemnation of his original business location—at least, the jury could have so found. Moreover, the Commonwealth failed to offer any evidence in support of its claim that the $9,000 it paid Pou for moving expenses on March 20, 1979 included payment for either dismantling. Thus, the district court did not err in upholding the jury verdict granting compensation for both dismantlings.

(b) Moving Expenses

As noted above, appellant paid appellees $9,000 in March, 1979 to cover the cost of the original move to the Playa de Ponce location. We discern no error in the jury award of an additional $9,000 to cover the expense of the subsequent move to the Calle del Sol location. The applicable regulation, 32 C.F.R. § 641.62(a)(1), reads as follows:

(a) *Allowable moving expenses.*

(1) Transportation of individuals, families, and personal property *from the acquired site to the replacement site,* not to exceed a distance of 50 miles, except where the District Engineer determines that relocation beyond the 50–mile area is justified. The circumstances justifying the moving expenses exceeding the 50–mile limitation should be made a part of the record. (Emphasis added.)

Appellees urge that we view the twin relocations as part of a single move. Under this scenario, the initial move to Playa de Ponce was merely an interim measure allowing Pou to store and maintain his machinery prior to relocating his operation to Calle del Sol. Thus, all expenses incurred in moving "from the acquired site [the original location of Torrefaccion Mi Tacita] to the replacement site [Calle del Sol]" would be contemplated by the express terms of the regulation.

We need not accept this position in order to sustain the award. It matters little whether we analyze the relocation as one move in two stages or two separate moves—both necessitated by the condemnation. The jury was free to find that fairness and equity dictated that Pou receive compensation for *all* moving expenses incurred as a result of the expropriation. The facts firmly support that conclusion, and clearly the regulation does not by its terms prohibit full reimbursement for these costs. Again, given Congress' stated objectives in enacting the URA, a broad reading of the implementing regulations is appropriate. Indeed, at least ini-

---

7. Part 641 of 32 C.F.R. is no longer in effect, having been removed and reserved on February 27, 1986. 51 Fed.Reg. 7013 (1986).

tially, the Commonwealth appears to have appreciated that the equities with respect to this particular expense favor appellee. In its Reply to Plaintiffs' Motion Submitting Detailed Claims (dated April 30, 1982) appellant advised the district court that it was "willing and prepared to offer [appellees] $9,000.00 to cover their second move." Having suffered a belated change of heart, appellant asks this court to second-guess the jury's award. However, because the award on this item was neither contrary to law nor unsupported by substantial evidence before the jury, we are powerless to disturb it.

(c) Rental Expenses (Storage)

■ On March 20, 1979, the Commonwealth paid Pou $9,000 to cover the cost of storing his equipment for a six month period. Pou received a second $9,000 payment, covering an additional six month period, on August 16, 1979. Appellant does not contest the propriety of these two payments. Rather, its position is that the court erred in allowing appellees to recover storage costs in excess of those incurred during the initial 12 month period.[8] The governing regulation, 32 C.F.R. § 641.62(a)(4), is reproduced below:

(a) *Allowable moving expenses.*

(4) Storage of personal property for a period *generally* not to exceed 12 months when the District Engineer determines that storage is necessary in connection with relocation. (Emphasis added.)

As the district court observed, although the regulation contemplates reimbursement for a storage period "generally not to exceed 12 months," its terms "presuppose that in exceptional circumstances a longer period may be justified." *Pacheco v. Aquino,* Civil No. 80–1736 (RLA) slip op. at 11 (D.P.R. April 24, 1984) (opinion and order). The court properly assigned Pou the burden of establishing that the Commonwealth acted arbitrarily in not exercising its discretion to

pay storage expenses beyond the one-year term. *Id.*

■ From the evidence presented by Pou the jury could and did conclude that the "exceptional circumstances" of this case warranted additional compensation. Uncontradicted testimony illustrated the complexity of the relocation effort. First, as discussed above, the equipment was moved twice, initially to Playa de Ponce and later to Calle del Sol. Second, although Pou intended Calle del Sol to be the permanent site of Torrefaccion Mi Tacita, appellees were unable to secure the permits necessary to operate the business there.[9] Perhaps in a more perfect world appellees would have been able quickly to relocate their business and resurrect their operations. Here, however, from the date Pou vacated the appropriated properties up until trial, Torrefaccion Mi Tacita remained inoperative. In these exceptional circumstances, the jury was free to award storage expenses incurred beyond the one-year period.

(d) Search Costs

■ The jury allowed Pou $55,000 compensation for costs incurred in searching for a replacement site for his business. Appellant complains bitterly that this amount represents "a whooping [sic] 11,000% of what is allowed by the regulation." That regulation, 32 C.F.R. § 641.64 provides:

§ 641.64 Reasonable expenses in searching for replacement business or farm.

(a) *Allowable.*

(1) Actual reasonable travel costs.

(2) Extra costs for meals and lodging.

(3) Time spent in searching at the rate of the displaced person's salary or earnings, but not to exceed $10 per hour.

(4) In the discretion of the District Engineer, broker, real estate, or other profes-

---

**8.** Apart from the $18,000 the Commonwealth initially paid, Pou requested an additional $99,500 for storage costs. Ultimately, the jury awarded Pou $70,000 for this item.

**9.** Earlier, Pou obtained the operating permits necessary to relocate to a different location. However, he abandoned his plan when he learned that this property was also subject to condemnation proceedings.

sional fees deemed necessary to locate a replacement business or farm operation.

(b) *Limitation.* The total amount a displaced person may be paid for searching expenses may not exceed $500 unless the Chief of Engineers determines that a greater amount is justified based on the circumstances involved.

In its opinion and order of April 24, 1984, the district court ruled that an amount greater than $500 "may be justified depending on the circumstances involved." [10] If proper facts are proved, we agree with this legal proposition. One such instance, represented by the current case, is if it is shown that it would be an abuse of discretion for the administrative officials to refuse to allow a greater amount warranted by the particular circumstances.[11] Here, through uncontroverted testimony, not objected to at trial, Pou established that between the years 1977 and 1980 alone, he travelled more than 60,000 miles in search of a suitable location for his business. In addition, he testified to making several thousand dollars worth of telephone calls during the same period. Moreover, at trial Pou offered into evidence copies of his cancelled checks which documented, in painstaking detail, his precise search expenses. The record is replete with evidence from which the jury could reasonably conclude that appellee properly incurred $55,000 in reimbursable search expenses and that that amount should have been allowed.

(e) Reinstallation Expenses

■ Because Pou was forced to relocate his business twice, he incurred dual reinstallation expenses. At trial, the parties stipulated that each reinstallation of machinery and equipment (first at Playa de Ponce and later at Calle del Sol) cost $51,-300. Consequently, the jury award of $102,600 for this item reflects full compensation for reinstallation at both locations.[12] According to the Commonwealth, the appropriate regulation contemplates reimbursement for only one reinstallation. However, we discern in the regulation's language no prohibition against reimbursement of more than one reinstallation expense where, as here, the additional installation was precipitated by conditions entirely outside appellees' control, and ultimately stemming from the condemnation.

32 C.F.R. § 641.62 declares in relevant part:

(a) *Allowable moving expenses.*

(6) Removal, reinstallation, reestablishment, including such modification as deemed necessary by the District Engineer, and reconnection of utilities for machinery, equipment, appliances, and other items, not acquired as real property. Prior to payment of any expenses for removal and reinstallation of such property, the displaced person shall be required to agree in writing that the property is personalty and that the Government is released from any payment for the property.

As explained above, appellees presented uncontroverted evidence that the equipment and machinery were reinstalled on two occasions. The rationale supporting a jury award covering both reinstallations is identical to that proferred above with respect to reimbursement for both dismantlings. *See supra* Part III(a). In sum, the applicable regulation does not explicitly prohibit full compensation for both reinstallations and the generous purposes of the URA are best served in this case, on the basis of the facts shown, by complete reimbursement of these expenses.

(f) New Equipment and Machinery

■ In an order dated February 14, 1986, the district court held that appellees

---

10. We need not pass upon the applicability of regulations of the United States Army Corps of Engineers and a publication of the Department of Transportation and Public Works entitled "Orientation and Relocation Procedures in Federally Funded Projects." Although the district court consulted both sources for guidance, it relied on neither to dispose of the issues before it.

11. There is evidence that appellees repeatedly sought to present their claims to the administrative officials but were unsuccessful.

12. Originally, Pou claimed $225,000 and the Commonwealth offered $62,000 for reinstallation expenses.

were "entitled to [recover the value of new equipment and machinery under the Relocation Act] provided, however, at trial they are able to establish the old equipment was lost due to [appellant's] acts or omissions, the need for the new equipment and its value." *Pacheco v. Aquino*, Civil No. 80–1736 (RLA) (D.P.R. Feb. 14, 1986) (order). At trial, appellees submitted proof as to each of the three elements and the jury awarded $393,300 to cover the cost of new equipment and machinery.

The Commonwealth urges that the URA does not authorize payment of the value of new equipment and machinery in any circumstances. Further, appellant complains that, in allowing recovery for this item, the district court created a tort action against the Commonwealth in violation of the Eleventh Amendment of the Constitution. Both of these arguments lack merit.

■ The mere fact that the URA and the regulations adopted pursuant thereto do not expressly provide for this individual remedy does not necessarily preclude its existence. *Young v. Harder*, 361 F.Supp. 64, 71–72 (D.Kan.1973). Moreover, a private civil remedy may be implied where the legislative purpose and history of the statute and the thrust of the regulations make plain that those protected are intended to have an individual interest of this type. *See, e.g., Tunstall v. Brotherhood of Locomotive Firemen and Enginemen*, 323 U.S. 210, 65 S.Ct. 235, 89 L.Ed. 187 (1944); *Gomez v. Florida State Employment Serv.*, 417 F.2d 569 (5th Cir.1969). As noted earlier, the overriding purpose of the Relocation Act is to protect individuals displaced as a result of a federally assisted program and to insure that these persons will be fairly and equally treated. *Harder*, 361 F.Supp. at 71. *See also Louisiana Dept. of Highways v. Coleman*, 444 F.Supp. 151, 154 (M.D.La.1978) (major purpose of URA is to assure that one who is displaced by a federally assisted program does not suffer a loss if that loss can be reasonably compensated by a money payment). The jury award to Pou for the value of new machinery and equipment is consistent with the stated policy of the Relocation Act, its legislative

history, and the cases interpreting that statute.

*Robzen's Inc. v. HUD*, 515 F.Supp. 228 (M.D.Pa.1981), relied upon by appellant, does not compel a contrary result. In that case, the Wilkes Barre City Council appropriated property belonging to Robzen's Inc., a meat processing facility. Robzen's brought suit against the Department of Housing and Urban Development (HUD) to recover a variety of moving expenses including the need for substitute equipment. The district court disallowed recovery of the cost of substitute equipment based upon its reading of the governing regulation, 24 C.F.R. § 42.65(b)(5). That section provided:

Where an item of personal property which is used in connection with any business or farm operation is not moved but is replaced with a comparable item, reimbursement [shall be allowed] in an amount not to exceed (i) the replacement cost, minus any proceeds received from its sale, or (ii) the estimated cost of moving, whichever is less.

According to the Commonwealth, payment to Pou for the value of new equipment and machinery would amount to double compensation prohibited by the URA because appellees have already been reimbursed for the cost of moving and storing their old equipment. However, reliance on *Robzen's* is misplaced for two reasons. First, the regulations at issue in that case reside in Title 24 of the Code of Federal Regulations and therefore apply only to HUD-assisted projects. Second, *Robzen's* involved the application of the "Assembled Economic Unit Doctrine," a principle of Pennsylvania state law which requires the state to include in eminent domain awards an allowance for machinery, equipment and fixtures which cannot be economically moved to a new location. No such doctrine exists in Puerto Rico eminent domain jurisprudence. These key legal distinctions render meaningless attempts to draw parallels between *Robzen's* and the case before us.

Although an individual usually would not recover both moving expenses and the cost of new machinery and equipment, this is

not the usual case. Faced with an extraordinary factual predicate, the jury and court were free to fashion the special relief they did. The uncontroverted evidence demonstrated that Pou was forced to move his equipment and machinery twice, first from the condemned property to Playa de Ponce and thereafter, when the Commonwealth refused to pay for storage in excess of 12 months, to Calle del Sol. In addition, the delicate nature of torrefaction machinery coupled with Pou's inability to locate a site on which to operate and thereby maintain his equipment undoubtedly could be found to have contributed to the deterioration and loss of the equipment. The jury was free to find (as it apparently did) that "the old equipment was lost due to [appellant's] acts or omissions." Concomitantly, the jury could also reasonably conclude that new equipment and machinery were required to effectuate the broad purposes of the URA.

Contrary to appellant's position, in allowing recovery of the value of new equipment and machinery, the district court did not create a tort action against the Commonwealth prohibited by the Eleventh Amendment. That Amendment provides:

> The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another state, or by Citizens or Subjects of any Foreign State.

Although the Amendment by its terms does not bar suits against a state by its own citizens, the Supreme Court has consistently held that an unconsenting state is immune from suits brought in federal courts by her own citizens, as well as by citizens of another state. *Hans v. Louisiana*, 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890); *Duhne v. New Jersey*, 251 U.S. 311, 40 S.Ct. 154, 64 L.Ed. 280 (1920); *Great Northern Life Ins. Co. v. Read*, 322 U.S. 47, 64 S.Ct. 873, 88 L.Ed. 1121 (1944); *Employees v. Department of Public Health and Welfare*, 411 U.S. 279, 93 S.Ct. 1614, 36 L.Ed.2d 251 (1973). It has also been established that the Commonwealth of Puerto Rico enjoys the full protection afforded by the Eleventh Amendment. *Ezratty v. Commonwealth of Puerto Rico*, 648 F.2d 770, 776 n. 7 (1st Cir.1981).

■ Nonetheless, a state may waive its Eleventh Amendment immunity. *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984). And, as *Tullock v. State Highway Comm'n of Missouri*, 507 F.2d 712 (8th Cir.1974) (Associate Justice Tom C. Clark, United States Supreme Court, retired and sitting by designation), teaches, by accepting the responsibility of administering relocation benefits under the URA, the Commonwealth has assumed the same obligations as the federal government and has consented to suit. *Id.* at 715 (citing *Parden v. Railway of the Alabama State Docks' Dep't*, 377 U.S. 184, 84 S.Ct. 1207, 12 L.Ed.2d 233 (1964)). Should any doubt remain, this waiver of Eleventh Amendment immunity is implicit in the document outlining the responsibilities of the Commonwealth in connection with the federally-assisted flood protection project. That document contains the Commonwealth's promise to "[h]old and save the United States free from damages due to the construction, maintenance and operation of the project. . . ." Agreement Between the United States of America and Commonwealth of Puerto Rico for Local Cooperation on Channel Improvements of the Portugues and Bucana Rivers Project for Flood Protection and Other Purposes at Ponce, Puerto Rico 2.

### IV. *Miscellaneous Issues*

(a) Exhaustion of Administrative Remedies

■ In its opinion and order dated April 24, 1984, the district court ruled that further administrative proceedings would be useless and decreed that "it is in the best interest of the parties involved, and the matter will be more expediently handled, if we allow judicial review to proceed now." *Pacheco v. Aquino*, Civil No. 80-1736 (RLA) slip op. at 8 (D.P.R. April 24, 1984). That appellant had adopted a final position with respect to each of appellees' claims is evident from the former's written submis-

sion of May 3, 1982. Since the state agency had already denied coverage for benefits under the Relocation Act, "to require further administrative proceedings would be of no avail." *Tullock*, 507 F.2d at 715. Moreover, the fact that the claims had been at issue since 1978 counselled against prolonging the trek through the administrative swamp. Appellant has shown no error in the district court's ruling on this issue.

### (b) Refusal to Grant Appellant's Post-Judgment Motions

Following the jury's verdict, the Commonwealth filed a Rule 50(b) motion for judgment notwithstanding the verdict and/or for a new trial. By order of September 29, 1986, the court denied these motions. Unfortunately, appellant's "great miscarriage of justice" argument on this point is little more than an abortive attempt to entice us to second-guess the jury and the trial court. The motion for judgment n.o.v. may be granted only when, without weighing the credibility of the evidence, there can be but one reasonable conclusion as to the proper judgment. *Turner v. Johnson & Johnson*, 809 F.2d 90, 95 (1st Cir.1986); *Carter v. Duncan-Huggins, Ltd.*, 727 F.2d 1225 (D.C.Cir. 1984). Our appellate function in this regard is narrow. We have scoured the record and detect no material error by the district court.

### (c) Jury Instructions

■ At trial, the Commonwealth interposed a general objection to Pou's proposed instructions 19, 20, and 21. However, appellant never proferred instructions of its own. The crux of Rule 51 on this issue is that "[n]o party may assign as error the giving or the failure to give an instruction unless he objects thereto before the jury retires to consider its verdict, *stating distinctly the matter to which he objects and the grounds of his objection.*" Fed.R.Civ. P. 51 (emphasis added). Having failed to articulate with specificity the grounds of its objections, appellant cannot raise this issue on appeal.

### (d) Jury Trial

Appellant raises for the first time on appeal the issue of whether the district court erred in granting appellee a jury trial. It is sufficient to note that in this circuit an issue not presented to the trial court cannot be raised for the first time on appeal. *United States v. Ven-Fuel*, 758 F.2d 741 (1st Cir.1985); *Codex Corp. v. Milgo Electronic Corp.*, 717 F.2d 622 (1st Cir.1983).

## V. *Conclusion*

For the foregoing reasons, the judgment of the district court is in all respects

AFFIRMED.